No. 68,747

STATE OF KANSAS, *Appellee*, v. LARRY D. PECKHAM, SR., *Appellant.*

(875 P.2d 257)

Opinion filed May 27, 1994.

*Kiehl Rathbun,* of Wichita, argued the cause and was on the brief for appellant.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by defendant Larry D. Peckham, Sr., from his convictions of first-degree murder and aggravated robbery and from the "hard-40" sentence imposed.

The motive in this case is bizarre. The body of Raul "Roy" Hernandez was discovered in a field at 53rd and Greenwich Road in Wichita, Kansas, on March 6, 1992. He had been shot five times in the head, twice in the forehead with a .22 caliber weapon and three times on the right side of the head with a .38 caliber weapon. The gunshot wounds were inflicted on two occasions separated by a period of time.

Defendant had pending drug charges in Sedgwick County for which he had unsuccessfully attempted to negotiate favorable

treatment by offering to provide information to law enforcement officials. He told his son, Larry Peckham, Jr., his roommate, Robbie Clem, and a friend, Chris Roberts, about a plan he had devised in order to have bargaining power concerning his drug charges. He planned to commit two murders, frame the second victim for the murder of the first victim, and enlist Clem to provide information to law enforcement officials concerning the first murder in order to seek favorable treatment for both Clem and Peckham on pending charges. Peckham enlisted Clem to purchase a .22 caliber weapon for him, which she did. He also asked her for names of some possible victims for the second murder. He asked Roberts to help him make a silencer for a weapon.

On March 2, 1992, Peckham carried out the first part of his plan, the murder of Roy Hernandez. Hernandez had told his roommate and his girlfriend that he had met a man matching Peckham's description who had asked him to help "rip off a rip-off," or rob a drug dealer in exchange for money and drugs. Hernandez had several hundred dollars with him that day. On the evening of March 2, 1992, Hernandez borrowed a car from Margaret McBroom and a gun from Robert Cochran. Neither the money and wallet nor the gun were recovered, but McBroom's car was recovered on the morning of March 4, 1992.

On the evening of March 2, 1992, Cal Cofer, who lived behind the field where Hernandez' body later was discovered, heard what sounded like gunshots shortly after dark. He recalled that there were two shots in quick succession and two more shots after brief pauses. That evening, at 8:30 or 8:45, Peckham told Clem that he had committed the murder, and he showed her some .38 shell casings. He told her that a smaller caliber weapon, such as a .22, would not have killed the victim because he tried to run away. Clem drove out to the field with Peckham, and he had her drive around while he went back into the field. He took a gun with him, and when he returned he told her, "It's a good thing I checked, because the dude wasn't dead, I had to shoot him a couple more times in the head." That evening Peckham also stopped by his son's house between 8:30 and 9:00 and asked his son to make note of the time he was there and to possibly extend the time by 30 minutes, either earlier or later.

Several days later, Peckham enlisted Mike Furthmyer to help him dig a grave, and they did dig a hole under a bale of hay. Peckham also asked Furthmyer to help him melt down a gun, but Furthmyer and Peckham buried the gun instead. The .38 caliber revolver was recovered where Furthmyer and Peckham had buried it.

Peckham was convicted of first-degree murder and aggravated robbery. The jury recommended imposition of the hard-40 sentence. Peckham received a hard-40 sentence for first-degree murder and a consecutive 15 years to life sentence for aggravated robbery. He appeals. Peckham raises 19 issues on appeal. Many of these issues are moot because of our decision on the first issue.

## I. HARD-40 SENTENCE

K.S.A. 1993 Supp. 21-4624 provides certain notice requirements before a mandatory term of imprisonment of 40 years can be imposed following a conviction for first-degree murder.

"If a defendant is charged with murder in the first degree, the county or district attorney shall file written notice if such attorney intends, upon conviction or adjudication of guilt of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be required to serve a mandatory term of imprisonment of 40 years. Such notice shall be filed with the court and served on the defendant or the defendant's attorney at the time of arraignment. If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding and the defendant, if convicted of murder in the first degree, shall be sentenced as otherwise provided by law, and no mandatory term of imprisonment shall be imposed hereunder." K.S.A. 1993 Supp. 21-4624(1).

Peckham contends that the filing provision of K.S.A. 1993 Supp. 21-4624 was not complied with and therefore the district court erred in imposing a mandatory 40-year term of incarceration.

Peckham was arraigned on April 29, 1992, following a two-day preliminary hearing. At arraignment, or 10 minutes before arraignment, Peckham and his counsel were served with the State's notice of intent to seek the hard-40 sentence. However, a copy of the notice was not file stamped until the following day at 8:05 a.m. The file-stamped notice in the court's file is not an original notice and bears a photocopied signature. Peckham maintains that

the delayed filing of the notice precludes the imposition of a mandatory term of imprisonment.

Peckham first raised this issue after the jury returned a guilty verdict on August 14, 1992. Argument on this issue on August 17, 1992, reveals the following. Mr. Rathbun (defense counsel) informed the court that he was served with the notice on April 29, 1992, within 10 minutes before arraignment. Mr. Jennings (counsel for the State) recalled that he served the original of the notice on the defendant and his counsel, and he placed a copy of the notice on the judge's bench at that time. The record of arraignment is silent as to those events. However, the district judge stated that both he and his court reporter had a recollection of a copy of the notice being placed on the bench. Further, the judge stated, "[T]he notice that was placed on the judge's bench, though, apparently was not file stamped until the next day, April 30th." This implies that the copy file stamped on April 30, 1992, at 8:05 a.m. was the same copy that Mr. Jennings had placed on the bench on April 29, 1992, at the defendant's arraignment.

Peckham relies on *State v. Deavers*, 252 Kan. 149, 843 P.2d 695 (1992). There, the State neglected to give the defendant notice of its intent to seek the hard 40 sentence at arraignment which concluded just prior to the noon recess, but at 2:00 p.m. the same day the State requested another hearing and served notice on the defendant at that time. This court held that the notice requirement of 21-4624 is mandatory, and where the State fails to follow the requirement, the hard-40 sentence cannot be imposed. Prejudice to the defendant was shown by the mere fact that the defendant was subject to the enhanced sentence despite the State's failure to comply with the statute. This court asked a rhetorical question: "If 2 hours and 20 minutes beyond the requirement of the statute is acceptable, at what time beyond the statutory requirement does a court determine failure to comply with the statute is unacceptable?" 252 Kan. at 168. Thus, this court vacated the defendant's sentence.

The argument the State makes is two-fold. First, the State suggests that the language of K.S.A. 1993 Supp. 21-4624 does not require that notice be filed with the court at the time of arraign-

ment. The State posits that K.S.A. 1993 Supp. 21-4624 has two requirements: (1) notice must be filed with the court (but there is no time limit on the filing requirement) and (2) notice must be served on the defendant at the time of arraignment. The phrase "at the time of arraignment" applies only to the "service on the defendant" requirement and not to the "filed with the court" requirement, according to the State. Alternatively, the State argues that it did timely comply with the filing requirement by filing the notice with the district judge at the time of Peckham's arraignment.

There is a basis for construing the time frame within which notice must be served on a defendant to be different from the time frame within which to file such notice with the court. Although both the filing and service requirements are set forth in the same sentence, the phrase "at the time of arraignment" applies only to service of the notice and not to the filing requirement.

Contrary to the State's assertion, notice may not be filed with the court after arraignment. Notice can be filed with the clerk of the district court after the defendant is bound over for arraignment. (See K.S.A. 22-2905, which sets out the procedure for filing the information after the defendant is bound over for arraignment.) The filing of the notice with the court is a prerequisite to serving the defendant. The defendant shall be served with the statutory notice at the time of the arraignment pursuant to K.S.A. 1993 Supp. 21-4624.

The State's second argument depends on whether it did file the notice with the judge. K.S.A. 1993 Supp. 60-205(e) provides that a judge may permit pleadings and other papers to be filed with him or her, "in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk." "Although this statute is in the code of civil procedure, it may be considered applicable in criminal proceedings, there being no provision in the criminal procedures to the contrary." *State ex rel. Owens v. Hodge*, 230 Kan. 804, 808, 641 P.2d 399 (1982). If papers are filed with the judge, "filing is complete when the judge personally accepts custody of the papers." *Tobin Constr.*

Co. v. Kemp, 239 Kan. 430, Syl. ¶ 1, 721 P.2d 278 (1986). In *Tobin Constr. Co.*, this court noted the similarity of 60-205(e) to Rule 5(e) of the Federal Rules of Civil Procedure, under which "[t]he judge's failure to forward the papers forthwith or to enter a necessary date does not prejudice the party attempting to comply with the filing requirement." 239 Kan. at 436.

The critical question is whether the State filed its notice with the judge by placing a copy of the notice on the judge's bench at the time of arraignment. In denying Peckham's motion to preclude imposition of the hard-40 sentence, the district court stated:

"In addition to physically serving the defendant with written notice of the Hard 40, the State's attorney states here in open court that he also brought up a copy of it and laid it on the judge's bench. I have a recollection of that. My court reporter has a recollection of that. For whatever it's worth to mention that on the record now. But, the record is silent of that. I reviewed the record and there's nothing in the record to actually confirm that. But, I do have a specific recollection of it. The defendant is—oh, then the notice that was placed on the judge's bench, though, apparently was not file stamped until the next day, April 30th."

This does not show that the judge permitted the notice to be filed with him or that he personally accepted custody of the notice. It implies that the copy of the notice which was ultimately file stamped by the clerk was the same copy which the State placed on the judge's bench. However, there is no way to know who was responsible for having that copy file stamped. Did the judge or his court reporter transmit the notice to the clerk, or did the State retrieve the notice from the judge's bench and deliver it to the clerk the next day?

As noted by the trial judge, the transcript of arraignment does not show that the State gave a copy of its notice to the court. According to the trial judge, a copy—not the original—was placed on the judge's bench. The State did not indicate on the record that it was placing a copy of the notice on the judge's bench with the intent to satisfy the filing requirement of K.S.A. 1993 Supp. 21-4624 rather than as a courtesy to the judge.

We are dealing with what in 1992 was this state's equivalent to the death penalty. Thus, the State should follow the statute. Sloppy, incomplete records are insufficient to overcome the stat-

utory mandate that if the State fails to file and serve the notice as required by K.S.A. 1993 Supp. 21-4624(1), the mandatory term of imprisonment of 40 years cannot be imposed.

We conclude that in the absence of a record showing the district judge was furnished with the notice with the intent it be filed with the court pursuant to K.S.A. 1993 Supp. 60-205(e), there is not compliance with K.S.A. 1993 Supp. 21-4624(1) and the mandatory term of imprisonment of 40 years cannot be imposed. The record before us gives no indication the copy placed on the judge's bench was for any purpose other than as a courtesy, and the trial judge made no finding or comment that gives any indication the trial judge intended or contemplated that the copy placed on his bench was offered or accepted for filing pursuant to 60-205(e).

In *State v. Johnson*, 255 Kan. 140, 871 P.2d 1246 (1994), we reaffirmed *State v. Deavers*, 252 Kan. 149, Syl. ¶ 6, where this court concluded: "The notice provisions of K.S.A. 1991 Supp. 21-4624, the first-degree murder 'hard-40' sentencing statute, are mandatory. Failure of the State to comply with such provisions requires a sentence imposed thereunder to be vacated." The sentence imposed under K.S.A. 1993 Supp. 21-4624 is vacated, and we remand for resentencing.

## II. EXTENT OF WITNESS' PRIOR DRUG USE

Peckham's roommate, Robbie Clem, was a main witness against him during the guilt phase of this case. There were discrepancies in her testimony. For example, she testified that she made a telephone call to 911 on Wednesday and a call to radio station KFDI on Friday, but other evidence showed that both calls were actually made on Friday. Mr. Rathbun was permitted to question her about these discrepancies. She testified, "I've known my memory to lapse before. . . . It's my past drug usage, you know, and it just—sometimes I have a hard time remembering things, you know, it's not that I do things intentionally, you know, it's just that I've got a defective brain. It's not intentional.".

Defense counsel was not permitted to examine the witness concerning the extent of her prior drug use and treatment programs

she had been in. The trial judge reasoned that there was no evidence that she was under the influence of drugs at the time of the incidents about which she was testifying, that the witness had already testified that her previous drug usage had affected her memory, and that the prejudicial effect of such evidence far outweighed the probative value.

Peckham points out:

"For purposes of discrediting a witness, drug-use evidence is admissible to the extent it shows the witness was under the influence of drugs at the time of the occurrence as to which the witness testifies or at the time of trial. It is also admissible to the extent that it shows the witness' mind, memory, or powers of observation were affected by the habit." *State v. Osby*, 246 Kan. 621, Syl. ¶ 2, 793 P.2d 243 (1990).

See *State v. Coe*, 223 Kan. 153, 162-63, 574 P.2d 929 (1977); *State v. Nix*, 215 Kan. 880, Syl. ¶ 6, 529 P.2d 147 (1974); *State v. Belote*, 213 Kan. 291, 295-96, 516 P.2d 159 (1973). Thus, evidence that the witness' memory was affected by her prior use of drugs would be admissible here, even in the absence of any evidence that she was under the influence of drugs at the time of the events about which she was testifying.

The admission of evidence rests in the sound discretion of the trial judge. *Herbstreith v. de Bakker*, 249 Kan. 67, Syl. ¶ 11, 815 P.2d 102 (1991). The judge did not abuse his discretion in refusing to permit defense counsel to question the witness further in light of the fact that the witness had already testified that her prior use of drugs had impaired her memory.

In any event, the appellant has failed to include in the record on appeal the exhibit proffered to show the extent of the witness' drug use. He merely asserts in his brief that he "obtained records from Clem's State Parole Officer indicating that she had used marijuana for the last ten years, that she had used amphetamines for the last two years, and listed drug treatment programs that the witness had been in." However, at the out-of-the-presence-of-the-jury discussion between the parties and the court concerning permitting defense counsel to elicit from the witness the reason for the discrepancies in her recollection of the events, the State asked the witness how much time had elapsed from her last

usage of drugs or alcohol, and the witness indicated that more than six months had elapsed. Peckham does not suggest that the witness was under the influence of drugs or alcohol at the time of the events about which she was testifying. She had previously testified that her memory was adversely affected by her prior drug use. There is no showing that evidence of the extent of the witness' prior drug use would have provided additional evidence that her memory was affected by such drug use. Thus, the trial court did not err in excluding evidence about the extent of her prior drug use.

### III. EXCLUDING EVIDENCE OF A WITNESS' PROPENSITY FOR VIOLENCE

The defendant sought to introduce evidence that witness Robert Cochran had intimidated a witness who was to testify against Cochran in an unrelated case. Peckham's counsel indicated that the intimidating statements allegedly made by Cochran included threats that the witness

"won't make it to trial, he'll blow up their house, asking the[m] who would take care of their children after they were gone, and stating that he'd volunteer to care for the children, but it would be easier just to kill them, too, and there are—I think at one point Mr. Cochran went to the witness's house, that he had a handgun with him, that he threatened to shoot the witness's wife as well . . . ."

Counsel argued that Cochran was

"number one, the last person who will admit having seen the deceased living; number two, he said that he saw him shortly before whatever this drug rip-off was, because he remembers he had to leave Midnight Modeling and Security to his rendezvous with the drug dealers in the immediate future, that he was worried that he was going to be late and he hurried out of the business, he took with him a .22 pistol, Mr. Hernandez was killed—or was not killed, he was shot with a .22 pistol after he was dead. The—Mr. Cochran admits giving him a gun."

The State objected to the evidence because the intimidation charge arose nearly four months after the victim's murder and because the connection was too tenuous. The court declined to admit the evidence, stating that it was inadmissible to attack the witness' credibility and that as evidence that the witness, rather

than the defendant, killed Roy Hernandez, it was reaching and tenuous and had no probative value.

"When the state relies on direct evidence, circumstantial evidence that someone other than the defendant committed the crime charged is irrelevant in the absence of other evidence to connect such third party with the crime." *State v. Calvert*, 211 Kan. 174, Syl. ¶ 3, 505 P.2d 1110 (1973); accord *State v. Brown*, 230 Kan. 499, 499-500, 638 P.2d 912 (1982). Although the State's case against Peckham was based on circumstantial evidence, there was no error in excluding the proffered evidence of Robert Cochran's witness intimidation charge.

The defendant cites *State v. Hamons*, 248 Kan. 51, 805 P.2d 6 (1991). In *Hamons*, this court found that the case against the defendant, which included the defendant's bloody fingerprint at the murder scene and evidence that the victim's blood was on the defendant's shoes, was based on direct evidence linking the defendant to the murder scene after the victim was dead, but an inference was necessary to conclude that the defendant committed the murder. 248 Kan. at 60. The defendant sought to introduce evidence which placed two other people at the murder scene before the murder occurred and which showed that these two people had a motive and the opportunity to commit the murder.

"Under the facts of this case, when the State's case relies heavily on circumstantial evidence to prove defendant committed a murder, it is error to exclude circumstantial evidence that someone other than the defendant may have committed the crime, when the evidence proffered by defendant includes timely placement of another at the murder scene the evening before the homicide that involved an 'angry encounter' linked with an inference of a threat occurring the day the victim's body was discovered." 248 Kan. 51, Syl. ¶ 2.

However, this court held that exclusion of such circumstantial evidence was harmless error in light of the overwhelming case against the defendant. 248 Kan. 51, Syl. ¶ 3.

Here, the jury already had before it the evidence that this witness was perhaps the last person to see the victim alive, that this witness had given the victim a .22 caliber gun, and that the victim had been shot with a .22 caliber gun. The proffered evidence of

the witness' subsequent intimidation charge does nothing to link the witness to the victim's murder. Unlike in *Hamons*, there was no evidence showing that the witness had previously made threats against the victim or had a motive to kill the victim. The trial court did not err in excluding the evidence.

## IV. APPOINTMENT OF ONE PSYCHOLOGIST

On July 2, 1992, Peckham filed a motion to determine whether he was competent to stand trial, stating that he might be unable to assist in preparing his defense. On July 2, 1992, the trial judge ordered a psychological examination of Peckham by the Sedgwick County Mental Health Department. On July 13, 1992, the trial judge appointed Psychological Services Clinic to conduct a psychological examination of Peckham.

Peckham argues that the trial court "appointed Dr. Howard Brodsky to evaluate the appellant." He suggests that K.S.A. 1993 Supp. 22-3302(3)(c) requires the appointment of "two qualified licensed physicians or licensed psychologists, or one of each, to examine the defendant and report to the Court." Peckham contends that because the trial judge appointed only one psychologist, the trial judge failed to comply with the statute.

K.S.A. 1993 Supp. 22-3302(3) provides that the court shall determine the issue of competency:

"The court may order a psychiatric or psychological examination of the defendant. To facilitate the examination, the court may: (a) If the defendant is charged with a felony, commit the defendant to the state security hospital or any county or private institution for examination and report to the court . . .; (b) designate any appropriate psychiatric or psychological clinic, mental health center or other psychiatric or psychological facility to conduct the examination while the defendant is in jail or on pretrial release; or (c) appoint two qualified licensed physicians or licensed psychologists, or one of each, to examine the defendant and report to the court."

Peckham makes two errors in his argument. First, K.S.A. 1993 Supp. 22-3302 does not make appointment of any psychologist, or even an evaluation at all, mandatory. See *State v. Green*, 245 Kan. 398, Syl. ¶ 8, 781 P.2d 678 (1989).

Second, the record does not reflect here that the trial judge in fact appointed only one psychologist, as Peckham contends.

Initially, the Sedgwick County Mental Health Department was appointed, and this would be pursuant to K.S.A. 1993 Supp. 22-3302(3)(b) ("designate any appropriate psychiatric or psychological clinic, mental health center, or other psychiatric or psychological facility"). Although the order does not reflect that the appointment of the Mental Health Department was rescinded, the trial judge did appoint another facility, Psychological Services Clinic, to evaluate the defendant, also pursuant to K.S.A. 1993 Supp. 22-3302(3)(b).

At the competency hearing on July 17, 1992, the trial judge stated on the record that he had originally appointed Dr. Howard Brodsky to conduct the evaluation, but he had revised his order and appointed Psychological Services Clinic, a facility of which Dr. Brodsky was a member. This does show that the court initially appointed one psychologist to perform an evaluation, as Peckham contends. However, Peckham has failed to include the transcript of that earlier hearing in the record on appeal. The only record before this court includes the court's written orders appointing first the Sedgwick County Mental Health Department, and then Psychological Services Clinic, to conduct the evaluation, and the trial judge's statements concerning his recollection of the earlier hearing.

The trial judge also discussed why Psychological Services Clinic, rather than the Mental Health Department, ultimately conducted the evaluation.

"[W]e started off appointing Sedgwick County Department of Mental Health to perform the evaluation. Which is the customary procedure here in Sedgwick County. This defendant refused to cooperate with them, refused to do any standardized tests or even to talk with their psychologist. The reason that he gave, as communicated to the Court through his attorney, was that he thought they were in cahoots with the sheriff's department, he didn't trust them, and he wasn't going to talk to any psychologist, even though it was clearly pointed out the confidentiality provisions of the statute. To accommodate this defendant, I decided to go a different way, a way which wasn't objected to by counsel at the time, and not use Sedgwick County Department of Mental Health, but to use a different facility to perform the evaluation. Now, it's true, I originally said I was appointing Dr. Brodsky to perform the evaluation; but, upon taking a closer look at the statute, I could see the same things that Mr. Rathbun brought up before he even brought them up, and that's why I started the hearing today

making the record on the fact that, in actuality, I was appointing Psychological Services Clinic, which is a psychological clinic or psychological facility of which Dr. Brodsky is one of more than one doctor to perform the evaluation. And I think that that would fit into subsection 2 of the statute. And, in fact, we do have the report from the facility and it's clearly designated on the letterhead that it's from Psychological Services Clinic."

The competency evaluation was done at the defendant's request, and the first facility which was appointed to conduct the evaluation pursuant to K.S.A. 1993 Supp. 22-3302(3)(b) was unable to complete the evaluation because of Peckham's refusal to cooperate. Although not the standard procedure for the court, the court did make arrangements for another evaluation to be conducted. The written order of the court appointed Psychological Services Clinic, and this is clearly consistent with K.S.A. 1993 Supp. 22-3302(3)(b). The trial court did not err.

## V. COMPETENCY

The defendant asserts that Dr. Brodsky failed to conduct a thorough evaluation of the defendant in concluding that the defendant was competent to stand trial. The psychologist retained by the defendant, on the other hand, opined that the defendant was not competent. The defendant contends that the district court abused its discretion in finding him competent and in "placing a defendant this ill through the rigors of a five and one-half week murder trial."

Dr. Sam Harrell, who had evaluated the defendant, testified that Peckham exhibited signs and symptoms of clinical anxiety, which could interfere with a person's ability to assist in his or her defense. He also testified that in his opinion Peckham was not competent to stand trial at that time because he had a short-term memory loss and could not "recall and recollect pertinent data and information regarding the crime he's charged with here." However, he did not know the legal definition of competency. Dr. Harrell reviewed the report prepared by Dr. Brodsky and opined that Dr. Brodsky had not conducted a thorough enough evaluation to arrive at a legitimate determination of competency. Dr. Harrell admitted that he did not meet with Peckham after he was asked to evaluate Peckham's competency; rather, he eval-

uated Peckham for other reasons and the issue of competency did not arise until after he had completed his evaluation.

Dr. Brodsky testified that he spent 45 minutes evaluating Peckham. He did not perform any clinical tests. He admitted that he was not aware that Peckham was complaining of memory loss and chest pains. He also admitted that during his interview with Peckham he focused on Peckham's paranoid ideation rather than clinical anxiety or memory loss based on the traits Peckham was exhibiting during the interview. He testified that he had performed hundreds of competency evaluations in his career. Dr. Brodsky did view Dr. Harrell's report and admitted it appeared that Dr. Harrell had conducted adequate testing and that on the data with which Dr. Harrell was dealing, Dr. Harrell's "diagnoses appropriately follow from the procedures and tests that he administered."

The written psychological reports completed by Dr. Harrell and Dr. Brodsky were admitted and considered by the trial judge, but neither have been included in the record on appeal.

"[A] person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable: (a) To understand the nature and purpose of the proceedings against him; or (b) to make or assist in making his defense." K.S.A. 22-3301(1). K.S.A. 1993 Supp. 22-3302(2) and (3) vest the trial judge with authority to determine this issue of competency. "On appeal, the reviewing court's inquiry on a trial court's determination that a defendant is competent to stand trial is whether the trial court abused its discretion." *State v. Perkins*, 248 Kan. 760, Syl. ¶ 4, 811 P.2d 1142 (1991).

The trial judge did not abuse his discretion in finding Peckham competent to stand trial. The judge explained his ruling at length. He stated that his ruling was based on three factors: first, the lack of evidence that Peckham was incompetent; second, Dr. Brodsky's direct opinion that Peckham was competent; and third, the judge's own observation in court. He found that Peckham was able to understand the nature of the charges against him and to assist in his own defense and, therefore, Peckham was competent to stand trial. On the record before this court, this ruling was not

an abuse of discretion. Accord *State v. William*, 248 Kan. 389, 417, 807 P.2d 1292, *cert. denied* 116 L. Ed. 2d 89 (1991).

## VI. HEARSAY

Prior to trial, the court heard motions in limine from both parties. One of the issues concerned the admissibility of statements made by the victim, Roy Hernandez, to his roommate and his girlfriend. The judge ruled the statements admissible and gave four reasons for so ruling: first, the statements did not constitute hearsay as they were not being offered to prove the truth of the matter asserted; second, even if the statements were hearsay, they were part of the res gestae of the offense; third, the statements fit into the exception set forth in K.S.A. 1993 Supp. 60-460(d)(3); and fourth, the statements fit into the exception set forth in K.S.A. 1993 Supp. 60-460(j) as statements against interest.

At trial, Tammy Eaton testified that she was Roy Hernandez' girlfriend. The night before Hernandez' death, Gail Payne had stopped by Hernandez' house while Eaton was there. Eaton testified that after Payne left, Hernandez informed her that Payne had discussed setting Hernandez up with someone Payne knew who could help Hernandez get a "bunch" of money and cocaine. The next morning, Hernandez received a phone call from Payne and told Eaton he was going to meet Payne. Upon his return, Hernandez told Eaton that he had met Payne and a man and that the man asked him to help hurt and rob another man. Eaton testified that Hernandez described the man he met as being "old and ball-headed and he had glasses on." Hernandez also told Eaton that the man had given Payne $100 for introducing him to Hernandez. Eaton further testified that Hernandez told her he intended to get a gun to take with him. Defense counsel fully questioned Eaton about the statements she testified that Hernandez had made to her. Defense counsel made no objection on hearsay grounds to any of Eaton's testimony.

Kevin Wright testified that he was Hernandez' roommate and that on the day Hernandez died, Hernandez told him he was supposed to rip off some drugs and money from some people and a guy he had met would pay him. Hernandez had indicated

that he met a man through Gail Payne and described the man as in his 50's and with gray hair. As with the testimony of Eaton, defense counsel made no objection on hearsay grounds to any of Wright's testimony.

The State points out that Peckham failed to make a contemporaneous objection to this evidence at trial, and therefore the issue is not properly before this court. When an unfavorable ruling on an evidentiary question prior to trial is received, a party must make a timely objection to such evidence when introduced at trial in order to preserve the issue for appeal. See *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993). Although Peckham did make a motion in limine raising this issue prior to trial and received an unfavorable ruling, he failed to make a contemporaneous objection during trial as the evidence objected to was introduced. Therefore, Peckham may not on appeal complain of error.

In any event, the statements of Hernandez constitute part of the res gestae.

"Res gestae is a broader concept than an exception to the hearsay rule. It actually deals with admissibility of evidence of acts or declarations before, during or after happenings of the principal event. Those acts done or declarations made before, during or after the happening of the principal occurrence may be admitted as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence." *State v. Peterson*, 236 Kan. 821, Syl. ¶ 1, 696 P.2d 387 (1985).

The testimony of Wright and Eaton concerning comments Hernandez made to them linked Hernandez with a man matching Peckham's description. Peckham lured Hernandez to the field under the guise of having Hernandez assist Peckham "rip off a ripoff." This is what Hernandez told Wright and Eaton he was going to do. Hernandez' statements of his meeting with Peckham and how that was arranged are closely connected with the incident here, and therefore it appears that the trial court properly admitted Hernandez' statements as part of the res gestae.

## VII. PRIOR CRIMINAL ACTS

The State's theory of the case was that the defendant committed this murder in order to provide authorities with information about it so as to gain favorable treatment on drug charges

which were pending against him at the time of the offense. The State sought to introduce evidence of the drug case at trial. The defendant sought prior to trial to exclude such evidence. The court ruled in favor of the State, finding that the evidence was admissible under K.S.A. 60-455 because it was relevant to the motive, intent, preparation, and plan of the current offense; the motive, intent, preparation, and plan were substantial issues which were controverted and evidence of Peckham's drug charges was material and probative as to these issues; and the probative value of the evidence outweighed the risk of undue prejudice. The jury was instructed as follows: "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crime charged. This evidence may be considered solely for the purpose of proving the defendant's motive, intent, preparation and/or plan."

The defendant contends that admitting evidence of the results of his drug case was error because "[t]he fact that those charges were ultimately resolved against the Appellant is not evidence of the Appellant's intent" and because such evidence was prejudicial.

Detective John Heinrichs of the Sedgwick County Sheriff's Department testified that Peckham contacted him on July 2, 1991, regarding "[d]ismissal of a heroin case that was filed against him" and proposing to "turn in a major marijuana dealer, an individual who was bringing hundred pounds of marijuana into the Wichita area, and he would also turn over the individual who actually owned the heroin that we got out of his residence to us if we would dismiss the heroin charge." Heinrichs further testified that he told Peckham he could not deal with him because he had an attorney representing him and that no deal was struck "[b]ecause we didn't believe him" and "[b]ecause we knew that it was a lie." Heinrichs also recalled that the heroin case went on to trial and that after the first day-and-a-half of trial, Peckham absconded and did not return for the remainder of the trial. Heinrichs related that a marijuana charge was filed after July 15, 1991, against Peckham as well.

Robert Jobe, a special agent with the FBI assigned to Wichita, testified that he met with Peckham, Peckham's (former) counsel,

and an assistant U.S. Attorney on July 10 or 11, 1991, regarding a proposal in which Peckham would "furnish the identity of an individual and the location of a nuclear power plant which the unidentified individual had planned to bomb or blow up" and in exchange, Peckham requested, among other things, dismissal of marijuana charges which had not yet been filed against him but the filing of which was imminent. Ultimately the proposal was not accepted because "it was . . . my assessment and everyone involved's assessment that it was a fabrication, false information."

Robert Sterner, a prosecuting attorney of Calloway County, Missouri, testified that he met with Peckham and several others on December 19, 1991, in Calloway County. The purpose of the meeting was to obtain information from Peckham about a 1981 murder, and in exchange Peckham wanted Sterner to put in a good word with Sedgwick County authorities concerning a criminal prosecution Peckham was facing. Sterner testified that he called the Sedgwick County prosecutor's office to request a continuance of Peckham's trial in order to alleviate the time constraint that a trial would place on Peckham's assistance to Calloway County. Sterner related that Peckham expected Sterner to request leniency for him on the condition that the murder case was solved. Although an agreement was signed, Sterner stated that he never requested leniency in connection with Peckham's pending cases, which included one count of possession of marijuana and one count of possession of a controlled substance, because the information Peckham provided did not match with other information the people investigating the 1981 murder had.

The evidence admitted here, concerning Peckham's drug charges which were pending at the time of this offense, was properly admissible under K.S.A. 60-455. K.S.A. 60-455 states:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

This court has stated:

"In ruling upon the admissibility of evidence of a prior crime or civil wrong under K.S.A. 60-455, the trial court must: (1) determine it is relevant to prove one of the facts specified in the statute; (2) determine the fact is a disputed material fact; and (3) balance the probative value of the prior crime or civil wrong evidence against its tendency to prejudice the jury." *State v. Grissom,* 251 Kan. 851, Syl. ¶ 28, 840 P.2d 1142 (1992).

"Appellate review of the admission of prior crimes evidence under K.S.A. 60-455 is limited to whether the trial court abused its discretion or whether the trial court admitted clearly irrelevant evidence." *State v. Clements,* 252 Kan. 86, Syl. ¶ 2, 843 P.2d 679 (1992).

The trial court did not abuse its discretion in admitting evidence of Peckham's drug charges. Peckham does not argue on appeal that evidence of his drug charges was irrelevant or did not concern a disputed material fact. He only argues, "The State's whole theory is that to avoid a trial, the Appellant committed certain acts. The results of the trial are therefore clearly inadmissible and prejudicial." The trial court clearly found that all three prongs of the test for admissibility under K.S.A. 60-455 were satisfied, and the defendant has failed to show that this determination was an abuse of discretion. The trial court did not err in admitting this evidence.

## VIII. OFFERS OF COMPROMISE

In addition to objecting to evidence of the drug charges pending against Peckham at the time of Roy Hernandez' murder, Peckham objected prior to trial to the admission of evidence of his offers of compromise concerning those charges. The court ruled that such evidence would be admitted, finding that the rule making offers of compromise generally inadmissible does not apply when the offer of compromise was made in a different case.

Peckham contends that the trial court erred in admitting evidence of his offers of compromise in the drug case. However, he offers no argument in his brief on this issue, other than to restate the district court's ruling on this issue and to assert, "These statements necessarily brought before the jury the existence of prior charges, and as such were controlled by K.S.A. 60-455." The State contends that the issue is not properly before this court

because the defendant made no contemporaneous objection when this evidence was admitted and, alternatively, that the fact that offers of compromise in the drug cases would not be admissible in those cases does not prohibit offers of compromise in the drug cases as evidence in the murder case.

As discussed in the preceding issue, evidence of the drug charges pending against Peckham at the time of the offense in the case at bar was properly admitted. Evidence of the defendant's proposed plea negotiations in his drug cases as evidenced by the testimony of John Heinrichs, Robert Jobe, and Robert Sterner would have been inadmissible to prove Peckham's guilt in the drug cases. However, evidence of Peckham's offers of compromise in the drug cases is admissible in the murder case at bar. This evidence was central to the State's theory that Peckham killed Roy Hernandez to gain favorable treatment on his drug cases and was offered to prove his motive, intent, preparation, or plan in killing Hernandez. This evidence was properly admitted.

## IX. WITNESS' PRIOR CONVICTION

The defendant impeached one of the State's witnesses, Mark Linthicum, by questioning him about a prior conviction for theft. On redirect, the State elicited from the witness that the theft conviction occurred more than 20 years earlier. Immediately before the witness' testimony concluded, an off-the-record discussion occurred between counsel and the court, after which the witness was excused. After the next witness testified, defense counsel noted on the record that he had requested prior to the conclusion of Linthicum's testimony permission to introduce evidence of a 1988 drug conviction to rebut the inference he claims the jury was left with, that the witness had led a crime-free life since the theft conviction. The court excluded the evidence, stating that the witness' character had not been sufficiently brought into issue and opining that the witness had not left the jury with the impression that he had not engaged in any criminal activity subsequent to the earlier theft conviction.

K.S.A. 60-421 limits the admissibility of evidence of a witness' conviction for crimes not involving dishonesty or false statement.

Mark Linthicum's possession of marijuana conviction is not a conviction for a crime involving dishonesty or false statement. The only possible use of evidence of his prior possession of marijuana conviction was to attack his credibility. This was inadmissible under K.S.A. 60-421.

Further, exclusion of this evidence as rebuttal evidence was not error. "Rebuttal evidence is that which is presented to deny some fact an adverse party has attempted to prove or has placed in dispute." *State v. Burnett*, 221 Kan. 40, 43, 558 P.2d 1087 (1976). " 'The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice.' *State v. Phipps*, 224 Kan. 158, 161, 578 P.2d 709 (1978)." *State v. Lovelace*, 227 Kan. 348, 353, 607 P.2d 49 (1980). See *State v. Synoracki*, 253 Kan. 59, 65, 853 P.2d 24 (1993). There was no evidence or inference here that Mark Linthicum had led a crime-free life since his prior theft conviction. Thus, even if evidence of a prior conviction for possession of marijuana is admissible as rebuttal evidence, there was no evidence or inference here to rebut, and the trial court did not abuse its discretion in excluding the proffered evidence.

## X. OPINION TESTIMONY

As set forth in Issue VII, Detective Heinrichs of the Sedgwick County Sheriff's Department and Agent Jobe of the FBI testified that they did not reach an agreement with Peckham concerning his proposed offers in his drug cases because the information he sought to provide was not believed or was shown to be inaccurate. Robert Sterner of the Calloway County, Missouri, prosecutor's office testified that he did reach an agreement with the defendant concerning the information Peckham proposed to provide, but the agreement was not followed through on because the information was shown to be inaccurate. When Heinrichs testified that "we knew that [the information Peckham had provided] was a lie," defense counsel objected to this statement because "the witness may not comment on credibility." The court overruled the objection.

The State's theory was that Peckham's motive in killing Roy Hernandez was to obtain favorable treatment in his drug cases. The testimony was not admitted to establish or impeach Peckham's credibility. Rather, it was offered to show the process of the offers of compromise Peckham sought to negotiate in his drug cases.

In *State v. Steadman*, 253 Kan. 297, 304, 855 P.2d 919 (1993), this court stated that "police witnesses can testify from their experience as to a role the defendant played in an illegal enterprise—they cannot testify that in their opinion the defendant was guilty of the crime." Here, Heinrichs, Jobe, and Sterner did not testify that they believed Peckham committed the murder of Roy Hernandez or even that they believed Peckham was guilty in the drug cases. Each merely testified as to why Peckham's efforts at obtaining leniency in the drug cases failed, and this evidence was elicited to show Peckham's motive, intent, preparation, or plan in the murder case. We cannot say the prejudicial effect of this testimony outweighed the probative value or that the trial judge abused his discretion in admitting this evidence.

## XI. INSTRUCTION

Robbie Clem testified that she purchased a .22 Ruger gun at a pawn shop and gave it to Peckham to use. She purchased it using the name of Teresa Macy. On redirect, Clem explained that she had false identification in the name of Teresa Macy which had Teresa Macy's information but Clem's picture, and Clem had used this false ID to purchase the gun. The following exchange then occurred:

"Q. What else did you do with that driver's license?
A. Wrote checks.
Q. For whom?
A. Teresa on Teresa Macy account.
Q. Was anyone else involved in those checks?
A. Yeah.
Q. Who?
A. Janice, I don't remember her last name, she lives with Jake, Connie's brother, she wrote some and I wrote some.
Q. Who took you around?
A. Larry did, and Mike?

Q. Mike?
A. Furthmyer, on —
Q. Do you know —
    MR. RATHBUN [defense counsel]: Court note my objection, I'll make it on the record later.
A. Excuse me.
    THE COURT: No, we can't proceed that way.
    MR. RATHBUN: Could we approach?"

After an off-the-record discussion, defense counsel objected on the record that the testimony showed the defendant's involvement in check forgery with the witness, and he requested a mistrial. The trial judge denied Peckham's motion for a mistrial.

Defense counsel then sought a cautionary instruction after the trial judge indicated reluctance to give one because the jury would already be instructed regarding the admissibility of prior offenses for a limited purpose only and because a cautionary instruction would only amplify the situation. The court then indicated that if a cautionary instruction was given, it would reflect that the jury not consider any evidence of Peckham's involvement in a check forgery offense so that the jury would not confuse such an instruction with the admission of evidence about Peckham's prior drug cases and plea negotiations, which were admitted for limited purposes. The State argued that a cautionary instruction should not single out evidence of a check forgery. Defense counsel requested the following instruction:

"In your consideration of this case you are instructed and admonished to disregard and set totally from your mind any inference that the defendant may have participated in criminal acts other than those charged in this case. By this admonition, I do not mean to imply that such evidence exists or that such acts exist. You should make no such inference from this admonition."

The court declined to give this instruction, finding that it was too broad because the jury would be permitted to consider evidence of certain other criminal acts for limited purposes. Defense counsel was given an option, and he requested that the court's proposed instruction be given rather than no cautionary instruction. The judge then admonished the jury, "The jury should disregard any evidence about the defendant's possible involvement with Ms. Clem or any other witness in check forgery."

Peckham argues on appeal, without analysis, that "[t]he Court's instruction infers that the Appellant was possibly involved with the witness, and as such should not have been given."

The instruction given by the trial court was not erroneous. Testimony had been given, to which the defense objected. The jury was admonished at the request of the defendant, although the admonition did not use language the defendant requested. Peckham's contention that the instruction "infers that the Appellant was possibly involved with the witness" is faulty. The witness had already testified that Peckham was involved with her, although her testimony did not necessarily show that Peckham had been involved in her check forgeries. In instructing the jury to disregard the inference that Peckham was involved with the check forgeries, it was necessary for the court to limit the instruction to that evidence. Evidence of certain other crimes by the defendant was admissible for limited purposes under K.S.A. 60-455. There was a need in this instruction, therefore, to distinguish the evidence that Peckham had been involved with check forgeries from evidence that had earlier been properly admitted concerning other crimes Peckham may have committed. By instructing the jury to "disregard any evidence about the defendant's possible involvement with Ms. Clem or any other witness in check forgery," the judge did not impermissibly emphasize that inadmissible evidence.

## XII. PERCEPTION OF DEFENSE COUNSEL'S BELIEF

Larry Peckham, Jr., the defendant's son, testified that his father had told him of a plan to obtain favorable treatment on his drug cases by finding "an individual that he could work into his plan and to kill them and to set it up to look as though someone else had done it, and to do away with that person and bring forward an eyewitness to turn in to the police as his part of the deal." The witness also related that defendant had stopped by his house on March 2, 1992, the day of the murder, and asked him to make note of the time as an alibi because he had just shot someone named "Roy" or "Raul" north of town.

On cross-examination by Mr. Rathbun, Peckham Jr. admitted to having made a statement to the sheriff on March 25, 1992,

regarding his father's involvement in the murder. The witness stated that he had been arrested for aiding and abetting his father's bail bond jumping and that he was concerned about his (the witness') parole being revoked, so he sought to provide information in exchange for favorable treatment. Further, the witness admitted that he had met with defense counsel on June 11, 1992, and after a discussion informed defense counsel that his testimony at the preliminary hearing had not been true and that he made up the story because of pressure surrounding his new charges and the potential for a parole violation. A tape recording of this conversation was made and was played for the jury.

During redirect examination by the State, the witness testified about the circumstances in which the tape recording was made. The following exchange occurred:

"Q. Now, as far as this tape recording that Mr. Rathbun had with you in his office, how did that come about?

A. I—I went down to talk to Mr. Rathbun and to help to try to convince him that—you know, that what my dad was telling him was true and to defend him well.

Q. Had you talked to your dad before you went to Mr. Rathbun's office?

A. Yes, I had.

Q. Where did you talk to your dad?

A. At the jail.

Q. Will you tell us about those conversations, please?

A. My dad had told me that he was worried that Mr. Rathbun was wondering whether or not he was guilty or not and —"

Defense counsel objected to the evidence as hearsay and urged that such testimony made him (defense counsel) a witness in the case. The trial judge overruled the objection.

The defendant maintains that it was error to overrule the objection. He argues that because it would have been improper for the State to tell the jury "I believe the defendant is guilty," it is likewise improper for the State to place before the jury "defense counsel's opinions or beliefs regarding the guilt or innocence of the Appellant." Further, he contends that because the effect of the witness' statement was evidence that defense counsel did not believe his client was innocent, defense counsel was required to testify that he did believe his client was innocent.

The State submits that defense counsel was not made a witness in the case because there was no testimony before the jury that defense counsel did not believe his client was innocent. Rather, the witness' testimony was only that the defendant had doubts as to whether his attorney believed in his innocence. Thus, there was no evidence which defense counsel could rebut by testifying that he had never had doubts about his client's innocence. The State also points out that in making his objection in front of the jury, defense counsel stated, "I've never had any doubt in my mind about my client."

"Rebuttal evidence is that which is presented to deny some fact an adverse party has attempted to prove or has placed in dispute." *State v. Burnett*, 221 Kan. at 43. " 'The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice.' *State v. Phipps*, 224 Kan. 158, 161, 578 P.2d 709 (1978)." *State v. Lovelace*, 227 Kan. 348, 353, 607 P.2d 49 (1980). See *State v. Synoracki*, 253 Kan. at 65.

There was no evidence here that defense counsel could have rebutted by testifying. There had been no testimony that defense counsel in fact did not believe his client was innocent. Rather, the witness' testimony reflected at the most that the defendant was concerned about whether his counsel believed he was innocent. The trial court noted that "Peckham Jr. never said Rathbun told him he had doubts about the case; that would clearly be inadmissible. Peckham Jr. just said his father had doubts about the case. It's like any other statement the defendant's made to a witness in this case." As the State points out, "Testimony by defense counsel that he had no doubts about his client's guilt would not contradict testimony that his client had worries about whether his attorney was wondering whether he was guilty." The testimony by the defendant's son did not make defense counsel a witness requiring him to testify in rebuttal.

The statement by Larry Peckham, Jr., does not require reversal of the defendant's conviction. The testimony did not amount to evidence concerning defense counsel's opinion as to his client's guilt or innocence. The statement was made in response to a

series of questions about what motivated the witness to approach defense counsel and fabricate a story that the witness' prior testimony at the preliminary hearing had been false. The testimony was given after evidence of four different statements by the witness: first, he testified against his father at trial on direct examination; second, on cross-examination the tape recording made by defense counsel in which the witness stated that his earlier statements in the case were false was played for the jury; third, the witness had testified against the defendant at the preliminary hearing; and fourth, the witness' videotaped statement to the sheriff's department on March 25, 1992, was played for the jury. The witness' statement was not made to show the defendant's attorney's opinion as to his client's guilt or innocence or even to show the witness' own opinion as to his father's guilt or innocence; it was made only to show the witness' reason for recanting his prior testimony at the preliminary hearing and to explain the witness' prior inconsistent statement. The statement was one of many made by a witness whose credibility was challenged by both parties in the case because he changed his story several times. Under the circumstances, reversible error is not shown.

## XIII. DELAYED DISCLOSURE OF EXCULPATORY EVIDENCE

The defendant also contends that the State failed to timely reveal exculpatory evidence and that a mistrial due to delayed disclosure should have been granted. The delayed disclosure concerned State's witnesses Michael Furthmyer and Robbie Clem and involved in part action that law enforcement officials had taken on these witnesses' behalf in order to obtain more lenient treatment for the witnesses in pending criminal cases.

Mike Furthmyer was a confidential informant. Various reports had been provided to the defense during discovery, but the defendant maintained that none mentioned information provided by a confidential informant and none named the confidential informant. The State, conversely, maintained that all reports had been provided to the defendant and that these reports included affidavits which mentioned the existence of a confidential inform-

ant but the defendant never requested disclosure of the informant's identity. Witnesses from the Sedgwick County Sheriff's Department as well as Furthmyer were made available to the defendant during trial for interview concerning Furthmyer's status as a confidential informant once that status was disclosed.

The trial court did find that at least one report had not been provided to the defendant until the witness was testifying. The court also found that most of the confidential information provided by Furthmyer involved Peckham absconding during trial on his drug offenses and did not concern the case at bar. However, the court did note that Furthmyer did provide "evidence to the sheriffs about the alleged grave, but that was immediately made known to the defense, as well as the source of that information." The court also found that Furthmyer's status as a confidential informant was not exculpatory evidence with which the State had a duty to come forward and that if there was such a duty, the defendant was not prejudiced by the delayed disclosure. A continuance was granted at the defendant's request to review newly disclosed reports.

During Furthmyer's testimony, the defense sought to question him about a theft conviction and whether the sheriff's office helped him get favorable treatment on that case. A proffer was made, during which Furthmyer testified out of the presence of the jury that he was not sure whether the sheriff's office intervened on his behalf in that case. The court refused to permit the defense to question Furthmyer along this line. Furthmyer did testify that Detective Heinrichs gave him $100 for a water pump, belts, wrenches, and gas and turnpike fees.

Detective Heinrichs was recalled by the State, and he admitted to giving Furthmyer $100 and buying him several meals. After Heinrichs was dismissed, the defense recalled him to continue recross-examination, whereupon it was revealed that Heinrichs had intervened on Furthmyer's behalf concerning a theft charge.

The defendant also points to other evidence he claims is exculpatory. For example, not only did Heinrichs seek leniency for Furthmyer on his theft charges, but another detective did so as well. Further, another detective had questioned Furthmyer about

the murder of Roy Hernandez, and Furthmyer had denied having any knowledge of it; the report of this interview was not provided by the sheriff's office. Furthmyer was recalled to testify, and he was questioned about statements he had made to the authorities as well as about whether the sheriff's office had intervened on his behalf in his theft case.

Robbie Clem testified that she did not receive any favorable treatment on her check forgery case. However, Clem's parole officer testified that Heinrichs had contacted her several times concerning whether parole revocation should be sought and that Heinrichs had sought to intervene in Clem's parole hearing. Heinrichs also told Clem's parole officer that the district attorney would recommend that nothing be done in Clem's check forgery case. The defendant then moved for a mistrial because Heinrichs had withheld exculpatory evidence. The trial court agreed that the evidence was exculpatory, but refused to declare a mistrial because there was no prejudice to the defendant as all of the information was disclosed in front of the jury.

Peckham contends that the concealment of exculpatory evidence by the Sedgwick County Sheriff's Department is attributable to the State, although he admits that the State had no knowledge about most of the evidence the sheriff's office was withholding. See *State v. Humphrey*, 217 Kan. 352, 537 P.2d 155 (1975). He also admits that the evidence was ultimately disclosed to him during trial. He maintains, however, that the delayed disclosure still constitutes a withholding of evidence because it was done in bad faith. The crux of his argument here is that he is required to make a lesser showing of prejudice because the delayed disclosure was in bad faith.

In *State v. Carmichael*, 240 Kan. 149, Syl. ¶ 1, 727 P.2d 918 (1986), this court addressed the standard for granting a remedy when disclosure of exculpatory evidence is delayed:

"Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant."

"Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment." 240 Kan. at 153. Further, in *State v. Barncord*, 240 Kan. 35, Syl. ¶ 4, 726 P.2d 1322 (1986), this court stated that "[e]vidence not disclosed to the defendant before trial is not suppressed or withheld by the State if the defendant has personal knowledge thereof, or if the facts become available to him during trial and he is not prejudiced in defending against them."

In *Carmichael*, the exculpatory evidence was destroyed and therefore was not admitted at trial. In *Barncord*, the evidence was not purposefully withheld and the defendant was not prejudiced because he had ample opportunity to cross-examine the witnesses. Here, the evidence Peckham claims is exculpatory was ultimately admitted at trial.

The trial court determined that some of the evidence which was disclosed only during trial was exculpatory and some of it was not.

Peckham does not suggest what further evidence would have been revealed had he received timely disclosure of this evidence and been able to adequately investigate further. He does not suggest that his trial strategy would have differed had the evidence been disclosed before trial. Peckham's ability to examine each of the witnesses testifying was not prejudiced by the delayed disclosure during trial of this evidence. He received continuances or recesses where appropriate, and he was able to fully examine each witness. In fact, the delayed disclosure most likely worked to Peckham's advantage because the credibility of the witnesses testifying against him was severely impaired when they were recalled to the stand and additional information was elicited from them. We affirm the trial court and find that no prejudicial error occurred.

## XIV. SUFFICIENCY OF EVIDENCE

Next, defendant contends that there was insufficient evidence to convict him of the offense of aggravated robbery. He maintains that there was no evidence that the victim had any property taken

from him and that the trial judge erred in submitting the issue to the jury.

This court has addressed sufficiency of the evidence on numerous occasions.

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Grissom*, 251 Kan. 851, Syl. ¶ 4, 840 P.2d 1142 (1992).

See *State v. Getz*, 250 Kan. 560, 830 P.2d 5 (1992). "It is the jury's function, and not an appellate court's, to weigh the evidence and pass upon the credibility of witnesses." *State v. Holley*, 238 Kan. 501, 511, 712 P.2d 1214 (1986).

There was sufficient evidence to support the jury's finding of guilt for the offense of aggravated robbery. Testimony revealed that Peckham planned to kill a victim and plant a gun or other personal objects of that victim in a second victim's car or house. Robert Cochran testified that between 6:00 and 7:30 p.m. on March 2, 1992, Roy Hernandez borrowed a .22 caliber gun from him. Hernandez told Cochran at that time that he was going to "rip off a rip-off," and he offered him $200 for the use of the gun. That gun was never recovered. Cochran testified that Peckham's son later told him that Peckham had thrown that gun in the river. There was also evidence that Hernandez had several hundred dollars in his wallet and that he took his wallet with him when he left his house the evening he was killed. However, when Hernandez' body was found he did not have a wallet or money on his person. Although neither Cochran's gun nor Hernandez' wallet or money were recovered, the evidence presented at trial created a reasonable inference that Peckham did steal these items as part of his plan when he killed Hernandez.

Peckham's convictions are affirmed. The sentence imposed pursuant to K.S.A. 1993 Supp. 21-4624 is vacated, and we remand for resentencing.