No. 58,843

STATE OF KANSAS, *Appellee*, v. FLOYD CARMICHAEL, *Appellant*.

(727 P.2d 918)

Opinion filed October 31, 1986.

*Jessica R. Kunen*, deputy appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the briefs for appellant.

*Geary N. Gorup*, assistant district attorney, argued the cause, and *Robert T.*

*Stephan,* attorney general, and *Clark V. Owens,* district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The defendant appeals from his conviction of one count of aggravated kidnapping and two counts of rape. The defendant was sentenced to two terms of 30 years to life on the rape charges and a life sentence on the kidnapping charge, all sentences to run consecutively. On appeal the defendant raises numerous issues.

On July 15, 1985, S.C., the 15-year-old daughter of Floyd Carmichael, was sleeping when her father awakened her. Carmichael told S.C. he had been fighting with her mother and wanted S.C. to come with him to talk. After dressing, S.C. went upstairs. Carmichael told her he had killed her mother and he was going to rape her. He pulled a knife and led her into another room where he obtained a gun. S.C. was forced to return to her bedroom where she was raped.

The defendant then handcuffed S.C. and taped her head. She was placed in the back seat of a vehicle and driven around town. She was brought back to the home and raped again. Carmichael handcuffed and tied her hands, then locked her in the trunk of the car. After driving around for two hours, he stopped on a dirt road. After S.C. began to scream, her father released her from the trunk. S.C. attempted to talk him into driving her back to Wichita so she could go to school. Instead, he drove her to a coffee shop. While S.C. attempted to clean up in the restroom, Carmichael called his wife and told her that S.C. had run away the night before.

When the victim's mother returned home from work, there was no one at home. Her husband had not slept in his bed. After receiving Carmichael's call, she picked up S.C. at the coffee shop. Safely in her mother's car, S.C. told her mother what had happened. The mother took S.C. home and called the police.

During the trial Carmichael testified that S.C. had run away the night of July 15, that he drove around the neighborhood looking for S.C. until about 4 a.m, and that he went to work about 6:30 but, being concerned about S.C., he left work to look for her and found her walking near the high school.

The jury found Carmichael guilty of two counts of rape and one count of aggravated kidnapping. The State moved to enhance the sentence pursuant to the Habitual Criminal Act, K.S.A.

1985 Supp. 21-4504. The State used only the defendant's out-of-court statement to the court services officer about prior felonies to enhance the sentence.

The court applied the Habitual Criminal Act. It also found that a gun was used in the commission of the offenses. Carmichael was sentenced to a term of not less than life on count one, 30 years to life on count two, and 30 years to life on count three, the sentences to run consecutively.

Carmichael claims that his Fourteenth Amendment due process rights were violated because the State destroyed evidence that would have proven him innocent. His motion to dismiss based on the loss of exculpatory evidence was denied by the district court.

Carmichael was arrested on July 16. Unable to post bond, he was committed to the county jail. On July 19, S.C.'s social worker informed the Sedgwick County Sheriff's office that medical tests showed that S.C. had gonorrhea and Carmichael might have contracted it. The jail's medical clinic physician was called and given the information.

On July 25, a physician's assistant questioned Carmichael to determine if he exhibited symptoms of gonorrhea. Although he denied having symptoms, he was administered penicillin and another drug. The defendant neither objected to the treatment nor requested to consult with counsel.

The following day, defendant informed his counsel about the medical treatment. The defense counsel requested that the jail take a culture for gonorrhea. The physician's assistant refused to administer such a test, stating a valid culture was unlikely and the clinic was not equipped to take a culture.

The defendant contends that any evidence concerning his lack of gonorrhea was clearly exculpatory evidence. He argues that, since his wife did not have gonorrhea, evidence showing that he did not have gonorrhea would support his contention that he did not have intercourse with his daughter.

The State concedes that the actions of the jail's personnel are attributable to the prosecution. See generally *State v. Humphrey,* 217 Kan. 352, 537 P.2d 155 (1975). It argues, however, that the evidence was not clearly and unquestionably exculpatory and that the unavailability of such evidence was not clearly prejudicial to the defendant. It argues that it was not necessary

for the court to institute sanctions for destruction of exculpatory evidence.

Written stipulations concerning the defendant's motion to dismiss showed that approximately 20 percent of human males who contract gonorrhea do not exhibit the two typical symptoms of the disease, a discharge and a burning sensation during urination. Between 25 and 50 percent of those males who have consensual sexual contact with a female who has infectious gonorrhea will contract the disease. A recent study showed that, of males who sexually assaulted females, approximately six percent contracted gonorrhea as a result of the assault. When sexual contact between a noninfected male and an infectious female is nonconsensual, less than 25 percent of the males would be expected to contract gonorrhea as a result.

A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. *Brady v. Maryland,* 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant.

There are three classifications regarding suppression of evidence: (1) where there is a deliberate bad faith suppression for the purpose of obstructing the defense or intentional failure to disclose evidence which has high probative value and which could not have escaped the prosecutor's attention; (2) where there is a deliberate refusal to honor a request for evidence where evidence is material to guilt or punishment, irrespective of the prosecutor's good or bad faith in refusing the request; and (3) where suppression was not deliberate and no request for evidence was made, but where hindsight discloses that the defense could have put the evidence to significant use. *State v. Kelly,* 216 Kan. 31, 34, 531 P.2d 60 (1975).

In the present case, there is no evidence to suggest a deliberate bad faith suppression of the evidence or an intentional failure to disclose evidence by the prosecution. The testimony was that

the prosecutor did not order treatment for Carmichael and only learned of the treatment for gonorrhea after it occurred. The physician's assistant testified that when jail clinic personnel are informed that an inmate may have been exposed to any venereal disease, they are required by state law to treat the inmate, even without a court order, due to the risk of spreading venereal disease throughout the jail population.

Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment. In the present case, the presence of gonorrhea in the defendant would be more likely to show that he had had intercourse with the victim, since his wife did not have gonorrhea. The lack of gonorrhea would not disprove that the defendant had intercourse with the victim and would not be clearly exculpatory.

The question then is whether the defendant was materially prejudiced by the unavailability of the evidence. There are at least three different standards for determining materiality: (1) evidence which may be merely helpful to the defense; (2) evidence which raises a reasonable doubt as to defendant's guilt; and (3) evidence which is of such a character as to create a substantial likelihood of reversal. Comment, *Materiality and Defense Requests: Aids in Defining the Prosecutor's Duty of Disclosure*, 59 Iowa L. Rev. 433, 445 (1973).

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the record. *United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

Here, even if evidence defendant did not have gonorrhea had been admitted, there was still sufficient evidence to find the defendant guilty beyond a reasonable doubt. For example, the physician who examined the victim after the rape found superficial cuts on her throat and chin, a bruise mark on one shoulder, and contusions and bumps on both legs. Seminal fluid was found in the pelvic area. Handcuffs, a sleeping bag, rope, and tape were found in the trunk of the defendant's car. Footprints and a

burned cigarette were found in the area where the victim was released from the trunk. The gun, knives, and a roll of tape were found in the defendant's bedroom. Laboratory analysis of hair samples and blood types also supported the victim's story.

Evidence that the defendant did not have gonorrhea would not have prevented the jury from finding the defendant guilty beyond a reasonable doubt. The physical evidence plus the victim's statements support the jury's verdict. The unavailability of the evidence regarding the gonorrhea did not materially prejudice the defendant's Fourteenth Amendment due process rights.

The defendant claims that the district court erred in denying his motion to allow introduction of evidence concerning the presence of venereal disease in the victim. Six days before trial, the defendant filed a motion pursuant to K.S.A. 1985 Supp. 21-3525(2) seeking permission to introduce that evidence. The court indicated in chambers it would not allow waiver of the seven-day notice required by statute, even though all of the proffered evidence had been presented and discussed during the defendant's motion to dismiss.

The defendant's counsel argues that, although he filed the motion to admit the evidence pursuant to the rape shield statute, the evidence did not involve prior sexual conduct and was not covered by the rape shield statute and he would not have offered any evidence as to prior sexual conduct of the victim to determine the source of the venereal disease. Defense counsel would have proffered evidence to show that at the time the defendant was taken into custody, S.C. had a venereal disease, while the defendant did not. Without stating any reasons, the court denied the motion.

Since it could not be established that the defendant had or had not contracted gonorrhea, the evidence that the victim had gonorrhea was no longer relevant. The evidence would only show that the victim probably had intercourse with someone prior to the rape. This would indicate prior sexual conduct which the rape shield statute prohibits being admitted into evidence. Our legislature and a number of other state legislatures, as well as Congress, have enacted rape shield laws designed to restrict or prohibit the use of evidence regarding the chastity of the rape victim. The district court did not err in refusing to allow the

defendant to introduce evidence that would infer that the victim had previously engaged in sexual intercourse.

The defendant next argues that the Kansas rape shield statute is unconstitutionally vague because it fails to define "sexual conduct." He contends that evidence of venereal disease is not evidence of sexual conduct.

In determining whether a statute which uses the term "sexual conduct" is void for vagueness, two inquiries are appropriate: (1) whether the statute gives fair warning to those persons potentially subject to it, and (2) whether the statute adequately guards against arbitrary and discriminatory enforcement. A statute will not be declared void for vagueness and uncertainty where it employs words commonly used, previously judicially defined, or having a settled meaning in law. *State v. Robinson,* 239 Kan. 269, 273, 718 P.2d 1313 (1986).

In other cases before this court concerning the rape shield statute, attorneys and courts have been able to determine when "sexual conduct" was involved. For example, in *State v. Zuniga,* 237 Kan. 788, 792-93, 703 P.2d 805 (1985), defendant sought to introduce evidence of the victim's alleged pregnancy. The evidence was excluded as an attempt to evade the rape shield statute. In *State v. McQuillen,* 236 Kan. 161, 689 P.2d 822 (1984), motions were filed to consider the admissibility of evidence of rape trauma syndrome. In *State v. Bressman,* 236 Kan. 296, 689 P.2d 901 (1984), motions were filed to seek admission of evidence of a victim's possible gonorrhea.

Our research discloses no other jurisdictions which have considered whether the term "sexual conduct" is unconstitutionally vague. Alabama, in *Young v. State,* 429 So. 2d 1162, 1163 (Ala. Crim. App. 1983), held that the phrase "evidence relating to past sexual behavior" used in its rape shield statute was not void for vagueness. The court said that the statute was not so incomplete or irreconcilably conflicting or so vague and indefinite that it cannot be executed, and the court was able to determine with a reasonable degree of certainty what the legislature intended.

The defendant argues that sexual conduct involves acts or manner of behavior, while a disease is merely a condition of the body. While it is true that the term "venereal disease" does not by itself connote conduct, when it is used in the context of a rape trial it indicates some evidence of sexual conduct. There would

be no point in introducing evidence of such at a rape trial unless some form of sexual conduct was involved.

Within the context of the rape shield statute, a court is able to determine what conduct is sexual in nature and what evidence of such is prohibited by the statute. The term "sexual conduct," as used in the context of the rape shield statute, is not so vague that a person of common intelligence must necessarily guess at its meaning. The rape shield statute is not constitutionally void because of vagueness.

The defendant contends that the trial court violated his constitutional rights by limiting defense counsel's direct examination of the defendant. During the trial several verbal exchanges occurred between the judge and the defendant's attorney in the presence of the jury. Neither the judge nor the attorney chose to conduct a hearing outside the presence of the jury to discuss the points of law in question.

The State cites prior incidents during the trial where the attorney for the defendant objected to the State proceeding in a similar manner. Based on objections by the defendant's counsel, when questioning a witness, the State was restricted, which necessitated the witness being recalled later in the trial. Whether or not both the State and the defendant were limited in a similar manner is not the question. The question is whether the accused received a fair trial under the circumstances.

After the defense counsel had finished direct examination of the defendant, the following colloquy occurred between the judge and the defendant's attorney:

"Mr. Pullman: Thank you, Floyd. I don't have any further questions for you right now. Miss Craft might. Excuse me, I do have a couple questions, if the Court will briefly indulge. They're so obvious, I forgot to ask them.

"The Court: Well, if they're so obvious, you can withdraw them. Go ahead, Miss Craft.

"Mr. Pullman: They're obvious to me, Your Honor.

"The Court: Be seated, Mr. Pullman.

"Mr. Pullman: I would like to make an objection on the record about not even being able to proffer the questions for the Court's consideration.

"The Court: Be seated, Mr. Pullman.

Mr. Pullman: Yes, sir."

The record on appeal discloses at the close of the State's cross-examination no effort by the defense counsel to ask further questions or conduct redirect examination. Counsel neither attempted to recall the defendant to the stand to ask further

questions, nor did he specifically raise these questions in his motion for mistrial at the close of final argument or in his motion for new trial.

The purpose of the trial is to ascertain the truth or falsehood of the charges against the accused. The admission of evidence lies within the sound discretion of the trial court subject to the exclusionary rules. *McGuire v. Sifers*, 235 Kan. 368, 371, 681 P.2d 1025 (1984). It is also a matter of discretion whether the trial court permits either or both of the parties to reopen a case for introduction of additional evidence after having rested. *McDaniel v. Jones*, 235 Kan. 93, 114, 679 P.2d 682 (1984). An abuse of discretion exists only when no reasonable man would take the view adopted by the trial court. *Wilson v. American Fidelity Ins. Co.*, 229 Kan. 416, 422, 625 P.2d 1117 (1981).

In the present case, the trial court was exercising its control over the trial. It was a matter of discretion whether the court allowed defense counsel to reopen his examination of the defendant. Even though he was not allowed to ask his questions at that point, he had later opportunities when he could have questioned the defendant. Under the circumstances, there is no evidence of abuse of discretion on the part of the trial court.

The defendant contends that certain statements by the trial judge during closing arguments suggested to the jury that the burden to prove the defendant's guilt did not rest on the State but switched to the defendant.

During closing argument, the defense counsel stated: "Well, as has been indicated during the picking of the jury, the defense doesn't have to prove . . . ." At this point, the judge interrupted him, stating that "picking the jury is not part of argument of the case," and the defense counsel replied that the defense doesn't have to prove anything. The judge answered that there was no instruction to that effect. Then, a few minutes later, the defense counsel objected to a statement made during the State's closing argument that the defendant had claimed alibi but had failed to present corroborating evidence that was readily available. The defendant's attorney argued that the statement implied that the defendant had the burden of proof. The judge replied, "State has the burden, but that doesn't mean the Defendant doesn't have the burden of meeting the evidence. Overruled." Additional exchanges regarding points of law took place between the judge

and the defendant's attorney at this point in the presence of the jury.

Latitude permitted counsel in closing argument lies largely within the discretion of the trial court. *State v. Burton*, 235 Kan. 472, 483, 681 P.2d 646 (1984); *Skelly Oil Co. v. Urban Renewal Agency*, 211 Kan. 804, 508 P.2d 954 (1973). Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the accused. *State v. Diaz & Altemay*, 232 Kan. 307, 654 P.2d 425 (1982).

In this case, an instruction on the burden of proof, PIK Crim. 2d 52.02, was given to the jury. It clearly stated that the burden of proof was on the State. Any confusion the statements made by the judge may have created was clarified by the instructions. Under the circumstances, the court's statements were neither so prejudicial nor so unfair as to require that the defendant be given a new trial.

The defendant argues that he cannot be charged with the aggravated kidnapping of his daughter because, in the absence of a court order, he had legal custody of her. As authority, he cites domestic cases where one parent not having legal custody takes the child from a parent with legal custody.

We have found a State of Washington case that agrees with the defendant's claim that a parent having legal custody of a child cannot be convicted of kidnapping that child. In *State v. LaCaze*, 95 Wash. 2d 760, 630 P.2d 436 (1981), the father, while on furlough from the state penitentiary, went to his children's home where they lived with their mother. He told them that he had permission from the parole board to take custody of them for two weeks and that he was going to take them to Disneyland. During the trip he engaged in an incestuous relationship with the eldest daughter. The father was convicted of second-degree kidnapping of his own children. In a split decision, the Washington court determined under their second-degree kidnapping statute the defendant was not guilty because the statute required that the restraint of the children be by one "without legal authority". Since there was no court order taking legal custody of the children from the father, he could not kidnap the children.

The Washington statute is similar to our previous kidnapping statute. G.S. 1949, 21-449 made it unlawful for any person to willfully seize, confine, inveigle, decoy, kidnap, or take or carry away any person "without lawful authority." Under our prior statute, Carmichael's argument may have had some merit, but in 1969 our legislature changed the statute significantly.

K.S.A. 21-3420 provides:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:

(a) For ransom, or as a shield or hostage; or

(b) To facilitate flight or the commission of any crime; or

(c) To inflict bodily injury or to terrorize the victim or another; or

(d) To interfere with the performance of any governmental or political function.

Kidnapping is a class B felony."

The legislature deleted the phrase "without lawful authority." Kidnapping is now defined as the taking or confining of any person by force, threat, or deception with the intent to hold the person for specified purposes. Our kidnapping statute is now a general statute which includes a parent's intentionally committing acts prohibited by the statute.

Carmichael claims under the statute every parent who cares for and disciplines his or her child could be guilty of an infinite number of kidnappings. The rule of strict construction concerning penal statutes is subordinate to the rule that judicial interpretation must be reasonable and sensible to effectuate legislative design and the true intent of the legislature. *State v. Fowler*, 238 Kan. 213, 708 P.2d 539 (1985). Carmichael's concern that every caring parent who disciplines a child could be guilty of kidnapping is not justified. The kidnapping statute requires a specific intent on the part of the accused to commit one of the acts stated in the statute. The legislature never intended that parents not be allowed to discipline their children. Parents may discipline their children without violating the kidnapping statute. A parent who intends to inflict bodily injury to his or her child cannot, under the guise of parental discipline, bind the child with ropes and handcuffs, place the child in the trunk of an automobile, and move the child for the purpose of raping the child. Such conduct by a parent violates our kidnapping statute.

In his final argument, defendant contends the trial court lacked competent evidence to impose the Habitual Criminal Act.

Prior to sentencing, the presentence investigator questioned the defendant without notifying counsel and without informing the defendant of his right to silence and his right to counsel. During that interview, the defendant admitted he had been convicted of three prior felonies. The State did not attempt to introduce journal entries or other documents to verify defendant's prior convictions at the sentencing hearing. The defendant's out-of-court statements alone were used for enhancement of sentence.

This same issue was raised in *State v. Hicks,* 11 Kan. App. 2d 76, 714 P.2d 105 (1986). In *Hicks,* the defendant contended that the court erred in imposing the Habitual Criminal Act when the only evidence of prior convictions was the testimony of a court services officer that defendant had told him during the course of the presentence investigation he had a prior federal felony conviction. 11 Kan. App. 2d at 86-87. The Court of Appeals correctly found that the defendant's Fifth Amendment rights against self-incrimination were not violated, but held that the defendant's testimony did not constitute sufficient competent evidence under K.S.A. 1985 Supp. 21-4504(e) to enhance the penalty. We agree that the defendant's out-of-court statements were not sufficient competent evidence for enhancement. Defendant's sentences are vacated.

The convictions are affirmed and the sentences imposed are vacated. The case is remanded to the district court for resentencing pursuant to the law.

SCHROEDER, C.J., dissenting: I must respectfully dissent from Syllabus ¶ 6 and the corresponding portion of the opinion.

Construing K.S.A. 21-3420, as the court has done, will lead to absurd results. For example, where a father takes his child over whom he has custody by the arm and leads the child against its will from the house to a nearby barn to place the child on a gentle horse, knowing it will terrorize the child because of the child's fear of horses, it is kidnapping.

It must be conceded the facts in this case are hard, and the jury had sufficient evidence to find the defendant guilty of rape and other heinous acts had they been charged, but not kidnapping.

If the court's construction stands, it will also apply to a husband and wife. For example, the husband may take his wife by the arm and against her will to a bedroom upstairs, knowing the wife will be terrorized when she sees her children in the bed-

room playing with a harmless grass snake. Should this be kidnapping? I think not.