No. 71,067

STATE OF KANSAS, *Appellee,* v. ROY E. HUMPHREY, *Appellant.*

(905 P.2d 664)

Opinion filed October 27, 1995.

*J. Patrick Lawless*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, and *Steven R. Zinn*, deputy appellate defender, were with him on the briefs for appellant.

*Roy E. Humphrey*, appellant, was on the brief pro se.

*John K. Bork*, assistant attorney general, argued the cause, and *JaLynn Copp*, assistant attorney general, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is the direct appeal by the defendant, Roy E. Humphrey, from jury convictions upon retrial of one count of first-degree murder, two counts of aggravated assault, and one count of unlawful possession of a firearm. His convictions of one count of first-degree murder, one count of aggravated assault, two counts of attempted first-degree murder, and one count of unlawful possession of a firearm were reversed by this court, and the case was remanded for a new trial in *State v. Humphrey*, 252 Kan. 6, 845 P.2d 592 (1992) (*Humphrey I*). In sentencing, the district court invoked the Habitual Criminal Act, and the result is a term of three consecutive life sentences, which is to run consecutive to two consecutive 9- to 30-year terms and a 3- to 10-year term from which Humphrey was paroled at the time of the present offenses.

In late November 1987, Tony Gray and his wife, Tina, arrived in Garden City from California. They intended to assist Roy Humphrey in the manufacture of methamphetamine. Several weeks later, Tina's stepbrother, Gary McFadden, arrived to assist in the drug operation.

Sandra Bell lived with her children in a trailer behind Humphrey's house. She sold cocaine for him. Humphrey was on parole, and he was not supposed to own a gun. He traded cocaine for a 9-mm handgun, and Bell signed the receipt. Humphrey then carried the gun in a shoulder holster, which he wore most of the time.

Humphrey and McFadden did not get along with one another. On several occasions Humphrey said that he was going to "dust" McFadden, which meant that he was going to kill him. At trial, several examples of Humphrey's threatening McFadden with the gun were given.

On December 21, 1987, Tina Gray and Humphrey had been taking drugs in large amounts for three days and had not slept. Throughout the evening Humphrey, the Grays, Bell, and two other women who were present at the house, Jamie Jones and Pat Mendivil, were injecting cocaine, drinking liquor, and smoking marijuana.

At about 3 a.m. on December 22, Humphrey decided it was time to make the methamphetamine even though they had not received one of the necessary chemicals. Humphrey held his gun on the Grays and Jones as they carried chemicals and glassware from the bedroom to the kitchen. Tony Gray testified that during this process Humphrey seemed aggressive and quite dangerous. When McFadden returned from delivering some drugs for Humphrey, Tony let him in the back door and warned him not to bother Humphrey. McFadden spoke to Humphrey, gave Tony a light off his cigarette, and sat down in a chair.

All evening, Humphrey had argued with Jones; he accused her of being unfaithful, stealing from him, and not taking care of his children. He hit her, kicked her, spit on her, and pointed the gun at her. Several times he told her he ought to kill her. Soon after McFadden's arrival, Humphrey pointed his gun at Jones' head and she screamed, "No." Humphrey said she did not need to be worried because he was not going to kill her, he was only going to beat her, but he was going to kill the others. He turned and fired once. The bullet hit McFadden in the head, killing him.

Humphrey turned the gun toward Tony, who lunged at Humphrey and pinned his arm down. Jones took the opportunity to leave. Jones testified that she was not scared when Humphrey was holding the gun near her head because she did not believe he would use it.

Knowing that he could not hold Humphrey forever, Tony tried to redirect Humphrey's attention by suggesting that they make the methamphetamine. Humphrey, however, said that he would have to kill the Grays because they were witnesses. When Humphrey got free, he asked Tina if she wanted him to kill McFadden "again." He then made the Grays go outside and walk toward a field behind the house. Humphrey walked behind, pointing the gun at them.

Tina asked if she could overdose on drugs rather than be shot, and Humphrey agreed. While Humphrey was retrieving cocaine from a bag he was carrying, Tony was able to get the gun away from Humphrey.

Disarmed, Humphrey returned to the house, where he fell asleep on the couch across the room from McFadden's body. Tony went to Bell's trailer to tell her to get her children and leave. They took a cab to a motel.

Sometime during the day of December 22, Humphrey wrapped McFadden's body in a curtain and loaded it into a pickup truck which was parked behind his house. The following morning he moved the body to the back of a borrowed van. With his friend, Jesse James Jones, Humphrey buried the body in a sand pit area not far from his house.

In January 1988, Humphrey was taken into custody on a warrant issued in another case. When Mendivil went to see him in jail, Humphrey told her where to find McFadden's body, directed her in drawing a map, and named a person whom she should ask to move the body out of state. After the person designated by Humphrey refused the request, Mendivil took the map to the police.

Humphrey testified at trial. He did not deny shooting Mc-Fadden. Instead, he stated that he had not intended to shoot him and that the killing was accidental. He testified that he did not realize McFadden was in the house until after the shot was fired. Jamie Jones testified that she, too, was unaware of McFadden's presence until after Humphrey turned and fired the gun. Humphrey testified that, as Jamie Jones was leaving the house, he told her to call the police.

The first issue raised is whether Humphrey was denied due process by the State's failure to disclose evidence to him. Humphrey contends that two pieces of evidence were not disclosed by the State until trial, that they were exculpatory, that nondisclosure resulted in his not employing potentially fruitful lines of investigation and defense, and that there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed in a timely manner. The first evidence is the testimony of Pat Mendivil that on the morning of December

22, she telephoned Humphrey's house three times and the Grays answered. The second is a letter written by Mendivil to Detective Utz and sent in March 1989. The State denies that the evidence was suppressed or withheld, that the evidence was exculpatory, and that Humphrey was prejudiced.

Defense counsel told the district court judge that he learned of three telephone calls when he interviewed Mendivil the night before the fourth day of the trial, when she was called as a defense witness. Defense counsel represented that the officers knew about the phone calls much earlier. The prosecutor, not the same person who tried the case the first time, stated that he first heard of the telephone calls on the morning of the second day of trial, when the State called Mendivil as a witness. The prosecutor also reported that when he asked if she was sure, she said that she was "so messed up" at that time that she could not be sure when it happened. The district court denied Humphrey's motion to dismiss for failure to disclose on the ground that defense counsel should have called the matter to the court's attention before rather than after calling Mendivil and questioning her about the telephone calls.

In *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985), the Supreme Court decided that due process requires the prosecution to disclose material evidence favorable to the accused. The court stated: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682. The Supreme Court has rejected any distinction between impeachment and exculpatory evidence; both are evidence favorable to the accused for the purpose of the disclosure requirement. 473 U.S. at 676-77. In *State v. Carmichael*, 240 Kan. 149, Syl. ¶ 1, 727 P.2d 918 (1986), this court stated: "To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant." To be clearly prejudicial, the evidence must prejudice the defendant's ability to defend against the charges. *State v. Burnison*, 247 Kan.

19, 27, 795 P.2d 32 (1990). Applying these principles to particular circumstances, the court has decided that if the evidence becomes available to defendant during trial and he is not prejudiced in defending against it, the prosecution's failing to disclose the evidence earlier will not constitute a due process violation. *State v. Wacker*, 253 Kan. 664, 673-74, 861 P.2d 1272 (1993). It follows that the State's failure to disclose exculpatory evidence before trial is not reversible error where the evidence becomes available to the defendant during trial and does not prejudice the defendant's ability to defend against the charges.

Mendivil's testimony about telephone calls she made to Humphrey's house at approximately 5 a.m. on December 22 became known to defense counsel during trial. Mendivil was called as a witness by both parties. When called as a defense witness, she testified that while she was taking a shower in Bell's trailer between 3 and 4 a.m. she heard a loud bang. Hoping to get some cocaine before she left to go home, Mendivil knocked on the door of Humphrey's house. She was told by people inside the house, whom she thought sounded like Tony and Tina Gray, that Humphrey was asleep. She got home at approximately 4:45 a.m., checked on her daughter, and then telephoned Humphrey's house. Tony told her that everyone was asleep and hung up. Mendivil immediately called again, and Tina told her that everyone was asleep and hung up. Mendivil immediately called again, and Tony told her to quit calling and hung up.

Humphrey contends that this testimony is exculpatory "because it clearly refuted the Grays' testimony in which [they] stated that they were in imminent fear for their lives immediately after the shooting and fled at the first available moment." In fact, both Grays testified that after McFadden was shot and before they left, several incidents occurred: Humphrey was disarmed, he had fallen asleep on the couch, Bell was alerted, her children were awakened and dressed, and other preparations for departure were made. Thus, evidence of the Grays' answering Humphrey's telephone at 5 a.m. would not necessarily impeach their testimony.

With regard to prejudice, the contention continues, "[h]ad defense counsel been able to effectively cross-examine the Grays con-

cerning these phone calls, there clearly is sufficient probability to undermine confidence in the outcome of this case." This seems to mean that the credibility of the Grays could have been called into serious question by cross-examination. Tony Gray was not a witness. He died before Humphrey's retrial, and his testimony from an earlier proceeding was read to the jury by the State. Quite obviously defense counsel could not have cross-examined Tony Gray. Tina Gray had been released from the State's subpoena before Mendivil testified for the defense. Humphrey argues that "as a practical matter it was impossible to recall her," but the State disputes the argument and points out that Humphrey made no effort to recall her.

It also should be noted with regard to prejudice that there is little if any likelihood that Mendivil's testimony, even if fully as effective for impeaching Tina's testimony as Humphrey advocates, would have any bearing on the jury's findings on the murder count. Humphrey did not deny shooting McFadden. Humphrey testified that he accidentally shot him. The jury obviously did not believe him. Even if it is assumed for the sake of this argument that Tina testified on direct examination that they fled at the first possible moment after the shooting and on cross-examination their departure was shown to be more leisurely, any effect the modification might have had on the homicide count would be negligible, if any.

Humphrey was found guilty by the jury of premeditated first-degree murder of Gary McFadden, aggravated assault of Jamie Jones, aggravated assault of Tony Gray, and unlawful possession of a firearm. He was acquitted of aggravated assault of Tina. Humphrey was sentenced to consecutive terms of 9 to 30 years on the aggravated assault counts. In addition, Humphrey was sentenced to a term of three consecutive life sentences for the murder, which is to run consecutive to the terms for aggravated assault, the terms from which he was paroled at the time of the present offenses, and to a term of not less than 3 and not more than 10 years' imprisonment for unlawful possession of a firearm. With a term of three consecutive life sentences, which was to run consecutive to unspecified previous terms, and to 3 to 10 years being unaffected, it cannot be said that downward modification or even elimination of

the sentences for aggravated assault would likely make a difference in Humphrey's circumstances. Humphrey was 44 at the time of the sentencing in this case. We do not find prejudicial error has been shown.

The second piece of evidence which Humphrey complains was not disclosed to him is a letter written by Mendivil to Detective Utz and sent in March 1989, when she was living in California. He seems to be contending that the significance of the letter is that it is evidence that McFadden was still alive at 5 a.m. on December 22 and that he and Humphrey were in the same room and getting along, or at least speaking with one another. Indeed, in the letter Mendivil stated that she drove home from Humphrey's around 4:30 a.m. on December 22. She further stated that at approximately 5 a.m. she telephoned Humphrey's house and McFadden answered. McFadden said he would check to see whether Sandra Bell was asleep, and Mendivil then heard Humphrey say to tell her that Bell was asleep. Then Tina got on the phone and told her to call back later in the day because everyone was going to sleep. Mendivil wrote that she waited until approximately 6:30 a.m. to call again and that Jamie Jones told her to call later because Humphrey was asleep.

Thus, the real significance of this narrative portion of the letter seems to be that it shows that Mendivil told widely and materially varying versions of leaving Humphrey's house and making telephone calls. As the State suggests, her credibility is quite dubious. The record shows, however, that the letter was not admitted into evidence, and the only portions of it which were read to the jury did not include the narrative of events on December 22. The State asked her about the letter in an effort to show that her attitude toward Officer Utz had shifted from time to time. The prosecutor told the district court judge that the letter had not been provided to defense counsel during discovery because it was a personal letter to Officer Utz which was not exculpatory and had no relevance until defense counsel elicited Mendivil's testimony about her perceived mistreatment by police, Officer Utz in particular. The district court agreed that the letter was not exculpatory.

On appeal, Humphrey seems to treat the letter as if it and Mendivil's testimony about the events of December 22 were consistent and favorable to his defense. In fact, the two versions she gave are contradictory and completely incompatible. Humphrey has taken the position that Mendivil's testimony about Gray answering his telephone at 5 a.m. is exculpatory, and he elicited the testimony when she was called as a defense witness. There would seem to be no advantage to the defense to introduce a very different story which Mendivil told closer to the date of the murder. Likewise, there would seem to have been no advantage to trial preparation and strategy if defense counsel had received a copy of the letter during discovery.

Applying the standards recited above, we conclude that this issue is without merit. The evidence in question, especially when the testimony and the letter are considered together, is not clearly exculpatory. Moreover, it became known to Humphrey during trial. Thus, unless it appears that Humphrey was prejudiced in defending against the evidence, the State's failing to disclose it earlier cannot constitute a violation of due process. We find no prejudice in the circumstances of this case.

Humphrey next complains that his cross-examination of Tina Gray about her use of methadone at the time of trial was cut short. The district court's sustaining the prosecutor's objections during the following exchange is at issue:

"Q. Mrs. Gray, are you currently under the influence of any drugs or alcohol?
"A. No, I'm on—I'm not on drugs. I take Methadone.
"Q. Methadone. What is Methadone?
"A. It is a maintenance program.
"Q. Maintenance program. How long have you been on Methadone?
"MR. BORK: Objection, Your Honor, immaterial.
"THE COURT: Overruled.
"MR. BORK: It is immaterial. May I inquire, Your Honor?
"THE COURT: Of me? Overruled. Sit down.
"A. Oh, approximately off and on since '87. '88. No, '88.
"Q. Okay. And what is—you say Methadone is a maintenance program, what does that mean?
"A. It's—well, I was on it prior to the '91.
"MR. BORK: I object because it is immaterial.
"THE COURT: Okay. Sustained.

"Q. Okay. You are currently on Methadone, is that correct?

"A. Correct.

"MR. BORK: Objection. I just objected to this, Your Honor.

"THE COURT: Well, asked and answered. Sustained.

"Q. What is Methadone?

"MR. BORK: Objection as immaterial. That's been asked and answered?

"THE COURT: Sustained.

"MR. JOHNSON: Your Honor, it hasn't been answered.

"THE COURT: She said it was a maintenance program. She answered.

"Q. What is a maintenance program?

"A. It is to maintain you on Methadone.

"MR. BORK: Objection as immaterial.

"MR. JOHNSON: I think it goes directly to her—(interrupted)

"THE COURT: Goes to her what?

"MR. JOHNSON: Her ability to recall.

"THE COURT: Sustained.

"Q. Does Methadone in any way interfere with your ability to concentrate or recall?

"MR. BORK: Objection lack of foundation.

"THE COURT: Sustained.

"MR. JOHNSON: Your Honor, may I have one minute to confer with my client and then I think we'll be done. Your Honor, we have no further questions."

Humphrey contends that this is a legal question of which the court has an unlimited scope of review. The State counters that the standard of review is abuse of discretion. The State cites *State v. Peckham*, 255 Kan. 310, 318-19, 875 P.2d 257 (1994), in which defense counsel was not permitted to cross-examine a witness about her prior drug use and participation in treatment programs. We noted that the admission of evidence is discretionary and concluded that the district court judge had not abused his discretion in refusing to permit the cross-examination.

Humphrey also frames this issue as a matter of constitutional proportions. Humphrey contends that, because defense counsel was not permitted to cross-examine Tina Gray about her methadone use, he "was denied effective assistance of counsel, compulsory process and his right to effectively confront and cross-examine witnesses at trial. He was also denied his right to due process and a fair trial." In *Humphrey I*, he argued that his constitutional right to effective assistance of counsel and confrontation of witnesses was violated by defense counsel's cross-examination of Mendivil

being restricted. 252 Kan. at 16. He was attempting to show that she had received something from the State in exchange for her testimony. After discussing various protections afforded by the Sixth Amendment, this court concluded:

"Humphrey should have been afforded the opportunity to vigorously test Mendivil's credibility by cross-examining her about her relationship with the police. This might have led to a disclosure of an implied threat made by Utz. Rather than this error being ineffective assistance of counsel, we find it is trial court error which rendered trial counsel ineffective through no fault of counsel." 252 Kan. at 17.

Thus, this court rejected the characterization of this issue as a Sixth Amendment matter and treated it as an evidentiary matter which rests in the sound discretion of the district court.

Humphrey strove to show that Tina Gray's use of methadone at the time of trial affected her ability to recall the events about which she was testifying. This court has held that evidence of drug use is admissible for the purpose of discrediting a witness where it is shown that the witness is under influence of the drug at the time of trial. *State v. Nixon*, 223 Kan. 788, Syl. ¶ 2, 576 P.2d 691 (1978). Here, Tina Gray testified that she was on methadone rather than drugs. It seems likely that the distinction being drawn by the witness was between licit and illicit drugs, which was not responsive to defense counsel's question. Methadone, like aspirin, is an analgesic. An analgesic is defined as a medication that reduces or eliminates pain. A drug is a substance used as medicine in the treatment of disease. See The American Heritage Dictionary of the English Language 47 (1970). Thus, contrary to Tina's testimony, methadone is a drug. Once Tina answered in a way which conceivably could have been misleading, it would have been prudent for the district court to permit a line of questioning intended to set the record straight about the nature of methadone. The failure to do so, however, was not error.

The important question was whether Tina's use of methadone adversely affected her ability to testify about events which occurred more than 5 years previously. When defense counsel asked Tina, "Does Methadone in any way interfere with your ability to concentrate or recall?" the prosecutor's objection on the ground that

no foundation had been laid for the testimony was sustained. Defense counsel did not ask any more questions of Tina in an effort to lay a foundation. Moreover, Tina probably was not the right witness from which to get objective data about methadone. If defense counsel believed that the information would have been useful in the defense, he could and should have called an appropriate witness or devised some other way to introduce it during the defendant's case.

In addition, any error in restricting cross-examination of Tina was harmless. As the State points out, any lapses in her recollection due to the use of methadone at the time of the second trial could have been as effectively brought to the jury's attention by the use of her testimony at the preliminary hearing. Further, there was abundant evidence of Humphrey's guilt exclusive of Tina's testimony.

Humphrey also contends that it was error requiring reversal for the trial court to admit evidence of frequent arguing and physical blows between him and Jamie Jones in the 4 or so years before December 22, 1987. According to Humphrey, the evidence included Jamie's calling the police and Humphrey's being convicted of battering her on one occasion. The evidence was admitted over defense counsel's repeated objections.

The evidence to which Humphrey objects was admitted toward the end of a line of questioning which began when Jamie testified that she and Humphrey had gotten into an argument during the evening before McFadden was killed. She said that they argued frequently and hit each other. She said that, as a result, she had called the police "about twice" and Humphrey had served time in the county jail. The prosecutor asked whether Humphrey had been charged with battery, but Jamie responded that she was not certain what the charge was.

The parties agree that the admission of evidence lies within the sound discretion of the district court. *State v. Carmichael*, 240 Kan. at 157. Humphrey argues that the State's introducing evidence of a prior crime once the violent nature of their relationship already had been established could serve only the purpose of inflaming and prejudicing the jury. He further contends that the failure of

the trial court to give an instruction limiting the purpose of the jury's consideration of the battery conviction to the purposes specified in K.S.A. 60-455 requires reversal.

The State contends that no limiting instruction was required because the evidence was admissible independent of K.S.A. 60-455. Here, Humphrey was charged with aggravated assault of Jamie Jones, but she denied being frightened when he had the gun to her head. She downplayed the seriousness of the incident by saying that the gun was up to her face but pointing up rather than at her. The State impeached her testimony with her earlier written affirmative response to the question, "When Roy pointed the gun at you, did you think he was going to hurt you and if so why?" Her full response was: "Yes, because we had been arguing before and I've been hurt, abused, scratches on my eye." It is the State's position that evidence of the continuing course of violent conduct between Humphrey and the victim was useful to the jury's weighing Jamie's conflicting accounts. The State relies on State v. Jones, 247 Kan. 537, 547, 802 P.2d 533 (1990), where the court stated:

"We have recognized several instances where evidence of prior crimes or civil wrongs may be introduced into evidence independent of K.S.A. 60-455, including evidence to establish the relationship or continuing course of conduct between a defendant and the victim. Evidence of prior acts of a similar nature between a defendant and a victim is admissible independent of K.S.A. 60-455 if the evidence is not offered for the purpose of proving distinct offenses but, rather, to establish the relationship of the parties, the existence of a continuing course of conduct between the parties, or to corroborate the testimony of the complaining witness as to the act charged. PIK Crim. 2d 52.06, Comment, III, B(4), p. 70. See State v. Gray, 235 Kan. 632, Syl. ¶ 1, 681 P.2d 669 (1984); State v. Wood, 230 Kan. 477, 479, 638 P.2d 908 (1982); State v. Crossman, 229 Kan. 384, 387, 624 P.2d 461 (1981)."

See State v. Bowman, 252 Kan. 883, 889, 850 P.2d 236 (1993). We agree that Jones is controlling and find that the trial court did not err in admitting the evidence.

Humphrey next contends that the district court's instruction on voluntary intoxication was erroneous. The district court gave the following instruction on voluntary intoxication:

"Voluntary intoxication is not a defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged,

intoxication may be taken into consideration in determining whether the accused was capable of forming the necessary intent or state of mind.

"Voluntary intoxication is not a defense to a charge of Aggravated Assault or unlawful possession of a firearm."

Humphrey complains that the instruction differs from the ones he requested as well as from the pattern instruction. The pattern instruction that Humphrey contends would have been appropriate is PIK Crim. 2d 54.12-A (1992 Supp.), which states: "Voluntary intoxication may be a defense to the charge of (specific intent crime charged), where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary intent (set out specific intent element of the crime)."

Quoting this court's rule from *State v. Wilson*, 240 Kan. 606, 610, 731 P.2d 306 (1987), Humphrey first argues that the trial court should not substitute its own instruction for a pattern instruction " 'unless there is some compelling and articulable reason not to do so.' " However, Humphrey also requested a voluntary intoxication instruction which deviated from the pattern instruction. He also concedes that the instruction which was given by the district court was approved in *State v. Beebe*, 244 Kan. 48, 60-61, 766 P.2d 158 (1988). In fact, the instruction approved in *Beebe* was the version in PIK Crim. 2d 54.12 rather than the version appearing in the 1992 Supplement.

This court has often stated:

"Jury instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *State v. Walker*, 252 Kan. 279, Syl. ¶ 8, 845 P.2d 1 (1993).

In the present case, we cannot say that the voluntary intoxication instruction did not properly and fairly state the law as applied to the facts. The principal difference between the earlier pattern instruction and the current one is a shift in emphasis. Nor do we feel that the jury could reasonably have been misled by the instruction.

Humphrey next challenges the district court's authority to triple his sentence under the Habitual Criminal Act, K.S.A. 21-4504. The State requested that the district court triple each sentence given to Humphrey. In support of its motion, the State recited the following:

"The defendant was convicted in the District Court of Finney County, Kansas, on June 12, 1981, in Case No. 80-CR-422 of the crime of sale of hashish, a class C felony, in violation of K.S.A. 65-4127b(b)(3).

" . . . The defendant was convicted in the United States District Court for the District of Colorado, on December 2, 1977, in Case No. 77-CR-230, of the crime of possessing a firearm after being convicted of a felony in violation of Title 18 U.S. Code, appendix 1202(a), and received a sentence of twenty months in the Federal Correctional Institution at El Reno, Oklahoma."

The district court granted the State's motion in part, stating: "The court granted the State's Motion to Enhance and tripled the sentences imposed by the court except for the Unlawful Possession of a Firearm. Such sentences are to be served consecutively."

It is Humphrey's contention that the State failed to show that the federal offense relied upon for enhancement was a felony. He believes that resolution of this issue involves construction of the sentencing statute so that this court's review is unlimited.

The State agrees with Humphrey about the scope of review. It argues, however, that any objection which might have been raised to the federal offense as one of the felonies which would support tripling his punishment was waived by Humphrey when he failed to object to the presentence investigation (PSI) report. It is the State's contention that the supporting convictions were detailed in that report. The State adds that, in any event, it is clear from the 20-month sentence imposed for the federal offense that it was a felony.

At the sentencing proceeding, defense counsel was given an opportunity to bring to the court's attention any concerns he had about the PSI report. Defense counsel stated that there was nothing to bring up. The State then offered three exhibits for the purpose of supporting invocation of the Habitual Criminal Act. Exhibits 1 and 2 were evidence of a previous Kansas conviction, which is not in question on this appeal. With respect to the third exhibit,

the prosecutor stated: "The evidence of the other conviction is a United States Federal Conviction marked State's Exhibit 3 and I would submit those to court at this time." Defense counsel objected

"on the grounds that the State has not adequately proven that the convictions that the Court has been presented with are for the same Roy Humphrey that we have in Court here with us today. In other words, I guess the State hasn't provided adequate foundation to show that they apply to this particular case."

The district court concluded that there was an adequate basis for identifying defendant with the offenses and admitted the exhibits. The district court stated: "Your objection is noted, but if you'll recall I specifically requested any objections to the presentence and there were none either by you or the Defendant himself personally and those charges are all set forth therein."

There is no mention of the PSI report in Humphrey's brief. His argument is woven exclusively around the absence of any indication in Exhibit 3 that the federal firearms offense was a felony. Exhibit 3 is not in the record on appeal.[1] The documentation of a federal offense included in the PSI report seems to be for violation of the National Motor Vehicle Theft Act rather than a firearms charge.

The Court of Appeals was presented with very similar circumstances in *State v. Crichton*, 13 Kan. App. 2d 213, 766 P.2d 832 (1988), *rev. denied* 244 Kan. 739 (1989). Crichton contended that his sentence had been improperly enhanced because the documents relied upon by the State to establish an out-of-state offense "did not indicate there was a conviction for a felony, as opposed to a misdemeanor." The Court of Appeals did not reach the substantive issue, however, because "[t]he three documents concerning the Florida conviction are not in the record on appeal." 13 Kan. App. 2d at 217. The Court of Appeals quoted the following: " 'An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, we presume that the action of the trial court was proper.' *State v. Bright*, 229 Kan. 185, Syl. ¶ 6, 623 P.2d

---

[1] See modified opinion filed November 15, 1995. 258 Kan. 372.

917 (1981)." 13 Kan. App. 2d at 217. Here, as in *Crichton*, there is no way to consider the merits of Humphrey's contention.

Humphrey also complains that no limiting instruction was given which would have advised the jurors to consider evidence of the felony conviction for which he had been released within 5 years only for the purpose of establishing the elements of unlawful possession of a firearm in violation of K.S.A. 21-4204. Humphrey did not request that a limiting instruction be given. He relies on *State v. Whitehead*, 226 Kan. at 719, 722, 602 P.2d 1263 (1979), for the proposition that "[t]he failure to give a limiting instruction, regardless of request, is of such a prejudicial nature as to require the granting of a new trial." Humphrey recognizes that the rule applies to evidence admitted solely under the authority of K.S.A. 60-455. Hence, he argues that evidence of the prior crime is not admissible independent of 60-455 because it is a "material fact" by virtue of being a statutory element of 21-4204. To his way of thinking, therefore, evidence relevant to prove *a material fact* other than disposition to commit crime is not admissible independent of 60-455. Humphrey's reliance on *Whitehead* is misplaced. In *State v. Knowles*, 209 Kan. 676, Syl. ¶ 3, 498 P.2d 40 (1972), we held: "Where proof of a previous conviction is an essential element of a crime charged, failure to give an instruction limiting the purpose for which such conviction may be considered is not reversible error in the absence of a request." Thus, admission of evidence of Humphrey's recent release from imprisonment for a felony was not reversible error.

As he has done in the present appeal, Humphrey filed a pro se brief when this court considered his first trial on charges arising from the events of December 22, 1987. With regard to the first issue raised in that pro se brief, the court stated:

"Humphrey argues the trial court lacked jurisdiction over him because the State violated the speedy trial act, K.S.A. 22-3402. This argument is based upon Humphrey's allegation that he was held in custody, awaiting trial, more than 90 days when the time chargeable to the State in the original case, 88-CR-66, is added to the time chargeable to the State in the current case, 89-CR-166.

"We cannot consider this argument because the Finney County District Court file for case number 88-CR-66 has not been made a part of the record on appeal. Thus, Humphrey has failed to meet his burden of providing a sufficient record to

show the trial court committed prejudicial error. See *State v. Blackmore*, 249 Kan. 668, 670, 822 P.2d 49 (1991). We hold this issue is without merit." *Humphrey I*, 252 Kan. at 27-28.

On the present appeal, Humphrey contends that both his statutory and constitutional rights to a speedy trial were violated. Again, his argument depends on time chargeable to the State in the original case being added to the time chargeable to the State in the current case. Again, the district court file from the first case, 88-CR-66, has not been made a part of the record on appeal. For that reason and because this court's decision on this issue in *Humphrey I* is the settled law of the case, the issue will not be reconsidered in this appeal. In *Miller v. Zep Mfg. Co.*, 249 Kan. 34, Syl. ¶ 9, 815 P.2d 506 (1991), we stated the rule as follows:

"When a second appeal is brought to the appellate courts in the same case, the first decision is the settled law of the case on all questions involved and decided in the first appeal and reconsideration will not be given to such questions. This law of the case rule applies where the evidence in the second trial, or second appeal, is substantially the same as in the first appeal."

Humphrey next complains about the following comments made by the prosecutor during closing argument:

"Of course, the Defendant has a story that covers all of this. He now says it was an accident, but once again when apply[ing] that acid test of common sense you can only come to one conclusion. It was a good attempt at formulating a story trying to cover all the bases. It picks up threads of what actually happened that night. To that extent it seems like a plausible account, but then it should be; the Defendant has had five years to concoct that story. It must have started on the 22nd of December of 1987, and yesterday it made its debut. He's never told that story to anyone until he related it here."

Defense counsel's objection was overruled. Humphrey contends that the comments violated the rule of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), which prohibits a defendant's silence at the time of arrest from being used for impeachment purposes if he testifies on his own behalf at trial. In *State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976), this court overruled its own earlier rule in favor of the *Doyle* rule, stating:

"We interpret the decision of the United States Supreme Court in *Doyle* to settle the question so as to make it constitutionally impermissible for a state pros-

ecutor to impeach a defendant's exculpatory story told for the first time at the trial by cross-examining him as to his post-arrest silence after receiving the warning required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 [1966]."

The State denies that the comments related to Humphrey's post-arrest silence. First, the State asserts that Humphrey did not remain silent at that time. The State does not favor the court with references to where in the record the assertion may be verified. Second, the State asserts that the comments were directed to discrepancies between what Humphrey told his psychiatric expert witness, Dr. Modlin, and what he told the jury. Not too long after making the complained-of remarks, the prosecutor stated:

"The Defendant went to [Dr. Modlin] nine months after this had happened. And the Defendant told him at that time he just remembered three things; he remembered that there had been an argument with Jamie Jones, he remembered a gun going off, and he remembered talking to an acquaintance in the backyard. That's it. That is all he could remember nine months after this happened. And now he gives us details about what happened that you simply wouldn't find outside of a novel."

The State's explanation of its comments seems forthright. What Humphrey told Dr. Modlin certainly was important enough to warrant considerable comment by the prosecution. By pointing out discrepancies between the account of events related by Humphrey to Modlin and to the jury, the State succeeded in undermining the foundation for Modlin's supporting Humphrey's defense as well as impeaching the defendant.

In *State v. Green*, 245 Kan. 398, 406-07, 781 P.2d 678 (1989), this court applied the *Doyle* rule to comments made by the prosecutor in closing argument. There, the rule was stated broadly enough to include any comments by the prosecution. Shortly after Green was arrested for the shooting death of Zeola Wilson, it became apparent that he was injured. Examination revealed a bullet wound in his chest. Its origin was unexplained. In closing argument, the prosecutor observed that no witnesses had testified to being aware that Green had been shot. The prosecutor then said: "The defendant had every opportunity to tell the police, when asked, that he was injured." 245 Kan. at 406. Green had chosen to

remain silent after receiving the *Miranda* warnings. The court regarded the comment as a statement permissible for impeaching Green's evidence of self-defense rather than as an impermissible statement on Green's silence. Moreover, the court concluded that, if there were any error, it would be harmless. 245 Kan. at 407-08.

In the present case, the State's comments were permissible for impeaching the detailed account which Humphrey offered at trial. Moreover, there is doubt as to whether Humphrey remained silent, and any error had little likelihood of changing the results of the trial.

Humphrey's final contention is that it was a denial of his right to confront witnesses against him for the district court to permit the State to read into evidence the prior testimony of Tony Gray. He relies on *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980).

Both this court and the United States Supreme Court have made it clear that unavailability is an exception to the Sixth Amendment guarantee of the right to confront adverse witnesses. 448 U.S. 56; *State v. Wesson*, 247 Kan. 639, 650, 802 P.2d 574 (1990), *cert. denied* 501 U.S. 1236 (1991). At Humphrey's retrial, Tony Gray's deposition, which had been taken on February 23, 1988, was read to the jury. Gray was subjected to cross- and recross-examination during the taking of the deposition. This court has interpreted *Ohio v. Roberts* as stating that the opportunity to cross-examine at the prior hearing satisfies the Sixth Amendment Confrontation Clause, even absent actual cross-examination. 247 Kan. at 650 (quoting 448 U.S. at 70). Humphrey was not denied the opportunity for confrontation.

Humphrey also argues that Gray's deposition testimony was inadmissible hearsay. His specific contention is that the district court failed "to make a finding of a particularized guarantees [*sic*] of trustworthiness required for admission of a hearsay statement." He argues that a finding of trustworthiness would not be possible, as demonstrated by discrepancies in testimony given by Gray at various times. The flaw in his argument is that under K.S.A. 60-460(c)(2), Gray's prior testimony is excepted from the hearsay rule. The statute provides in pertinent part:

"[I]f the judge finds that the declarant is unavailable as a witness at the hearing, testimony given as a witness . . . in a . . . deposition taken in compliance with law for use as testimony in the trial of another action, [is admissible] when . . . the adverse party on the former occasion had the right and opportunity for cross-examination with an interest and motive similar to that which the adverse party has in the action in which the testimony is offered . . . ."

The judgment of the district court is affirmed.